ATTORNEY GENERAL, *ex rel.* MORELAND, *v.* COMMON COUN-
CIL OF CITY OF DETROIT.[1]

1. PUBLIC OFFICERS—OFFICE UNDER STATE—CONSTITUTIONAL LAW
—OFFICE OF GOVERNOR.

Any officer upon whom are imposed duties relating to affairs
of the State at large, as contradistinguished from those purely
local in their character, is an officer under the State, within
the meaning of section 15 of article 5 of the Constitution,
providing that no person "holding office under the United
States or this State shall execute the office of governor."

2. SAME—MUNICIPALITIES.

In the application of this principle, no distinction is made
between municipal and other officers.

3. SAME—MAYOR OF CITY.

The office of mayor of a city whose charter makes the
mayor a conservator of the peace and a member of the board
of health, and empowers him to administer oaths, and hear
complaints and annul or suspend licenses for violations of the
city ordinances or any other law of the State, is, therefore, an
office under the State.

4. SAME—INCOMPATIBLE OFFICES—VACANCY.

A person who, while occupying one office, accepts another in-
compatible with the first, *ipso facto* vacates the first office.

5. SAME—POWER OF REMOVAL.

Two offices are rendered incompatible, precluding one per-
son from holding both, by a valid legislative provision vesting
in the incumbent of one the power of removal over the other,
even though the contingency upon which the power is to be
exercised is remote.

6. SAME—MUNICIPAL OFFICERS—CONSTITUTIONAL LAW.

1 How. Stat. § 653, which authorizes the governor, in cer-
tain cases, to remove officers chosen by the electors of cities
and villages, is valid, under article 15, § 13, of the Con-

---

[1] This proceeding was instituted in the name of the attorney gen-
eral upon *mandamus* issued to him by the Supreme Court on the
application of Mr. Moreland. Upon the hearing, the attorney gen-
eral appeared and filed a brief in support of respondent's position.

stitution, conferring upon the legislature exclusive authority over the incorporation and organization of cities and villages, and article 12, § 7, requiring the legislature to provide by law for the removal of any officer elected by a county, township, or school district.

7. Same—Charter Provisions—Repeal of Statute.

The right of the governor to exercise the power of removal under such statute is not superseded as to the mayor of the city of Detroit by the mere fact that the charter of the city provides for the removal of other city officers, but not of the mayor.

8. Same—Vacancy—When Declared.

The fact that the mayor of a city was elected to the office of governor after a public declaration of an intention, if elected, to continue to perform the duties of mayor, is entitled to no weight in determining whether the former office was vacated by an acceptance of the latter.

*Mandamus* by Fred A. Maynard, Attorney General, on the relation of De Witt H. Moreland, to compel the common council of the city of Detroit to call an election to fill a vacancy in the office of mayor. Submitted March 17, 1897. Writ granted March 19, 1897.

*Fred A. Baker* and *John J. Speed*, for relator.

*Charles Flowers*, *C. D. Joslyn*, and *George Gartner*, for respondent.

Hooker, J. Hon. Hazen S. Pingree was elected mayor of the city of Detroit, and while an incumbent of that office was elected to, accepted, and entered upon the execution of the duties of the office of governor. He continues to perform the functions of both, and the petition in this proceeding proceeds upon the theory that, by accepting the latter office, that of mayor has become vacant, and a writ of *mandamus* is asked commanding the respondent to call an election to fill such vacancy. Two theories are presented under which it is contended that Mr. Pingree cannot hold these two offices at one and the same time:

1. That he is prohibited by section 15 of article 5 of the Constitution, which says: "No member of Congress, nor any person holding office under the United States or this State, shall execute the office of governor."

2. That the two offices are incompatible under the rules of the common law.

Many cases have arisen upon similar provisions of the various constitutions, and, while the decisions are not altogether uniform, we shall find them in substantial harmony upon two propositions, viz.: *First*, that an officer of a city, whose duties are simply and purely municipal, and who has no function pertaining to State affairs, does not come within the constitutional description of officers holding office under the State; and, *second*, where officers in cities are appointed or elected by the community in obedience to laws of the State which impose duties upon them in relation to State affairs, as contradistinguished from affairs of interest to the city merely, such as relate to gasworks, sewers, waterworks, public lighting, etc., they are upon a different footing, and may properly be said to hold office under the State. We will first consider whether this distinction is a proper one to be made under our Constitution, and it must be determined upon adjudicated cases elsewhere, and such lights of a domestic nature as our own decisions and discussions afford.

There are cases which hold that a similar provision is to be applied only to constitutional offices, and it is contended here that, at the most, the provision does not include all offices that are held under State authority; that officers elected by counties, townships, school districts, etc., should be excluded. In the State of Louisiana that seems to be the rule, as has been repeatedly declared, under the following constitutional provision, viz.: "No person shall hold or exercise, at the same time, more than one civil office of emolument, except that of justice of the peace." The cases sustain the statement, and some of them go the length of holding that the section applies

only to constitutional offices. They all rest upon the decision in the case of *Dorsey* v. *Vaughan*, 5 La. Ann. 155. In that case the question before the court was whether a person could be, at the same time, sheriff and parish tax collector. The court said that "the office of parish tax collector, if office it be (upon which point we express no opinion), is a municipal office; that of sheriff is a State office. The incompatibility contemplated by the constitution is the holding of two State offices." No authority is cited in support of this construction, nor is any reason given, and, as an authority, this case has no intrinsic value outside of Louisiana, except that which any decision should have by reason of the eminence of the judges who made it. See, also, *State* v. *Blanchard*, 6 La. Ann. 515, which deals with another constitutional provision; and *Voorhies* v. *Fournet*, 15 La. Ann. 597; *State* v. *Montgomery*, 25 La. Ann. 138; *State* v. *Newhouse*, 29 La. Ann. 824; *State* v. *Somnier*, 33 La. Ann. 237. From the foregoing it would appear that the Louisiana authorities sustain the proposition contended for, viz., that only State offices, as contradistinguished from those pertaining to counties, etc., are within the provision of the Louisiana constitution; and not only that, but they must be offices created by the constitution. Offices of lesser subdivisions seem to be treated as municipal offices; and as the "parish" in Louisiana is defined by Webster to be "a civil division, corresponding to a county in other States," it is obvious that *Dorsey* v. *Vaughan* was not in fact treating of a municipal corporation proper, but a *quasi* corporation, and this may perhaps be explained by the fact that the civil law is the substratum of Louisiana jurisprudence. This use of the term "municipal corporation" does not seem to be adopted in the other cases that we shall discuss, and we mention it to clearly show that the Louisiana cases differ in important particulars from others. We recall no other case that goes so far as to hold that county and township offices, so called, are not "offices held under the State."

Counsel for the respondent are of the opinion that the Louisiana cases are reinforced, and that view shown to have been entertained, by our constitutional convention of 1850, not by reason of its treatment of this particular provision, but in its discussion of a kindred provision appertaining to the eligibility of members of the legislature, viz., section 6 of article 4. The counsel have, we think, misapprehended the purport of the discussion in the constitutional convention. So far from the members of the convention entertaining the opinion that the expression "officer under the State" means the same thing as "State officer," the contrary view appears to have been expressed by every member who is recorded as having addressed the convention upon the subject. Mr. Bush, referring to the provision in the Constitution of 1835 which reads, "No person holding any office under the United States or of this State, officers of the militia, justices of the peace, associate judges of the circuit and county courts, and postmasters excepted, shall be eligible to either house of the legislature" (section 8, art. 4), said that—

"Under it the question of the eligibility of certain county officers had been frequently before the legislature, and it was yet uncertain whether they rightfully held their seats or not. It was urged by some that county and township officers were excluded from holding seats, from the very fact that justices of the peace were excepted He had never been in the legislature without witnessing some confusion growing out of the election of a county officer, judge, clerk, or some other."

Mr. Bush further stated that it was the duty of the convention to set the matter at rest. Mr. McClelland thought that—

"The general interpretation of the clause of the Constitution was as stated by the member from Ingham (Mr. Bush), that all officers were excluded save those specially excepted. * * * In regard to the cases of county officers holding seats, mentioned by gentlemen, he believed the question of their eligibility had been referred

to committees, but, if rumor was correct, those committees had withheld their reports, and the officers thus permitted to remain and hold their seats in the legislature. The question was not settled."

After an amendment inserting the words, "or any county office," had been proposed, Mr. Goodwin said:

"It has been remarked that the corresponding section in the present Constitution has occasioned a great deal of discussion in the legislature. It has received a broad construction, and one, I think, not in conformity with its object and intent."

After quoting the provision, he proceeded:

"One would have supposed that the phraseology would have excluded county officers, yet it is well known that they have been admitted to seats. I remember a case that occurred two years ago. A contested election of a county clerk had been returned to the house of representatives, and he had obtained a certificate of his election. The question came up as to his competency to hold the seat; yet he was permitted to retain it. I understood it was decided that the proper construction of the section was that it merely applied to State officers; in common parlance, officers appointed directly by State authority."

It will be noted that Mr. Goodwin was of the opinion that, although the clause had, in this instance, been interpreted to mean "officers appointed directly by State authority," this was a misconstruction, and the provision should have been construed as excluding county officers as well. He offered an amendment, of which he said: "It will put the matter beyond the probability of any ambiguity or misconstruction." See Convention Debates 1850, pp. 129–131.

It will be seen, therefore, that there was in the convention no apparent disagreement as to the proposition that section 8 of article 4 of the Constitution of 1835 excluded others than those who were "appointed directly by State authority," nor is it easy to perceive why there should have been. In the same instrument (article 6, § 6) it was provided that each township might elect four justices of

the peace.    It is perfectly obvious, therefore, that if the words "office under the United States or of this State" were given a construction which limited them to "officers appointed directly by State authority," the exception, in the same section, of justices of the peace, was senseless; and as the words are susceptible of a construction which excluded officers   mediately   holding office under authority of the State, and administering State functions, it is to be assumed that they were employed in that sense.    It is also plainly inferable that, if the words were used in this sense in the section referred to, similar words were used in a like sense in section 16, art. 5, which reads:   "No member of Congress, nor any other person holding office under the United States or this State, shall execute the office of governor,"—a provision in the same language as is employed in section 15, art. 5, of our present Constitution.

It should, perhaps, be stated that the question cannot well arise under the corresponding provision of our present Constitution relative to the qualifications of members of the legislature (article 4, § 6), as the inhibition contained in that section, as appears by the Constitution actually adopted by the convention, signed by the members of the convention, and filed in the office of the secretary of state, does not apply to State officers; the words "or this State" having been omitted, whether intentionally or through inadvertence it is impossible to say. Certain it is that the vote adopting the Constitution was taken upon the engrossed copy, as appears by the proceedings of the convention (page 918).

In California, the constitutional provision was that "no person holding any lucrative office under the United States, or any other power, shall be eligible to any civil office of profit under this State," etc.    In *People* v. *Leonard*, 73 Cal. 230, the office of supervisor of a district was held to be prohibited.

The Indiana constitution prohibited the holding by one person, at the same time, of two lucrative offices

under the State, and was held to cover the office of county commissioner and county recorder. *Dailey* v. *State*, 8 Blackf. 329. In *Foltz* v. *Kerlin*, 105 Ind. 221 (55 Am. Rep. 197), a township trustee was held to be within the provision.

In Virginia the Code provides that "no person shall be capable of holding any post of profit, trust, or emolument, civil or military, legislative, executive, or judicial, under the government of this commonwealth," who holds certain other offices enumerated. *Bunting* v. *Willis*, 27 Grat. 144 (21 Am. Rep. 338), and *Shell* v. *Cousins*, 77 Va. 328, involved the office of sheriff, which is a county office, and, in the latter case, a "sampler of tobacco," in the city of Petersburg. These offices were held to be within the prohibition.

*Shelby* v. *Alcorn*, 36 Miss. 273 (72 Am. Dec. 169), held, under a provision prohibiting the appointment of a senator to "any civil office under this State which shall have been created during his term as senator," that a senator was not eligible to the office of levee commissioner of a county. In this case it was said:

"And it is laid down 'that a public officer is one who has some duty to perform concerning the public; and he is not the less a public officer when his duty is confined to narrow limits, because it is the duty, and the nature of that duty, which makes him a public officer, and not the extent of his authority.' 7 Bac. Abr. 280; Carth. 479. And we apprehend that it may be stated as universally true that where an employment or duty is a continuing one, which is defined by rules prescribed by law, and not by contract, such a charge or employment is an office, and the person who performs it is an officer. This was the rule applied by Chief Justice Marshall in the case of *U. S.* v. *Maurice*, 2 Brock. 96, in which it was held that an agent of fortifications was an officer. * * * The law itself provides that the levee commissioner shall hold his office for the term of two years, under such restrictions as are therein prescribed. He is required to give bond, and to discharge the duties of treasurer, in which position he is entitled to receive large sums of public money. The board of police, upon the report of

the levee commissioner as to the cost of the work to be done, is required to levy a sufficient tax to meet it; and he is required to take an oath 'that he will, in all things touching his office, seek to promote the best interests of his county and the State of Mississippi.' These directions, of themselves, without doubt, define the character of the place of levee commissioner, and determine it to be an office. But, in fact, the several acts on the subject contemplate the performance of duties to the public which are prescribed by law, for a stated compensation. * * * It follows, hence, that whether an office has been created by the constitution itself, or by statute enacted pursuant to its provisions, the incumbent, as a component member of one of the bodies of the magistracy, is vested with a portion of the power of the government, whether the portion of the power of the government which he is thus entitled to exercise is legislative, judicial, or executive in its character. * * * It is manifest that the local and limited power and duties of the levee commissioner can have no effect in determining the question whether his office is not an office under the State. A member of the board of county police, or a justice of the peace, is as much an officer under the State as the executive, the heads of departments, or a member of the judiciary. The powers attached to the office of levee commissioner evidently pertain to the executive branch of the government. Clothed with a portion of the power vested in that department, the commissioner, in the discharge of his proper functions, exercises as clearly sovereign power as the governor, or a sheriff, or any other executive officer, when acting within his appropriate sphere."

These cases proceed upon the theory that all officers whose duties are prescribed by general law, however trivial, perform their own particular portion of the business of the State. The levying and collection of taxes are State matters. So are all things connected with the State system of schools, construction and maintenance of public highways, and preservation of the peace, and these cases hold the generally conceded doctrine that all who have parts to perform in the general scheme are officers holding under the State, if their engagement rises to the dignity of an office, rather than a mere employment.

The next distinction made relates to municipal offices, and it is said that officers elected in cities are not to be classified with county and township officers, and cannot be said to hold office under the State; that such offices are held under the city. In the absence of authorities, we should hesitate before saying that the constitutional convention contemplated that a governor might be a sheriff, or county clerk, or a supervisor or highway commissioner, upon the ground that counties and townships are recognized agencies of government, each forming a territorial division to and upon which is given the privilege and imposed the responsibility of managing certain public affairs of the State in the respective localities. The sheriff is a conservator of the peace, and it is the peace of the State. The county clerk keeps the records of the State courts and other State records for his county as to births, deaths, taxes, and elections, and makes reports to superior officers. The county treasurer, judge of probate, superintendent of schools, and the board of supervisors all perform the duties imposed upon them within their respective counties, it is true, but in obedience to laws of general application and regulating State affairs. The same can be said of township, school, and highway officers. These are all part and parcel of the one great scheme of State government. But at this point it is said that we must draw the line; that when we pass the confines of the smallest village or the largest city the section does not apply. Such localities are parts of the State, State laws are in force within such territory, and the various officers have to perform many functions pertaining to State as contradistinguished from city affairs. The State revenues have to be levied, collected, and paid over by them through county officers, the same as in the township; highways have to be provided, repaired, and maintained; schools in substantial harmony with the State school system must be maintained, which are in part supported by the State school funds; the criminal laws are

enforced through justices' and other courts, constables, marshals, police officers, etc.; some officer in these localities has the custody of securities for debt, as does the township clerk; the council takes the place of the township board in the management of local affairs; elections for State, county, and local officers are in charge of city and village officers; and it is obvious that the volume of State business in a busy city is much greater and more complicated and important than in a rural township. Still it is urged that the Constitution makers had no intention of excluding occupants of municipal offices from executing the office of governor, while at the same time they prohibit incumbents of the office of overseer of highways, school inspector, or even notary public from performing the duties of governor.

It would seem manifest that, if the contention of counsel for the respondent is correct, it must be based upon some other reason than a lack of interest on the part of the State in the performance of their duties by city officers. We do not recall a reason that has been given that will serve to explain satisfactorily why the mayor of a city should be permitted to execute the office of governor, when the incumbent of the lowest office in a township or a post-office at crossroads is prohibited. But, plain as this may seem to be, there are cases which make a distinction between State and municipal offices, and we will discuss them.

In Pennsylvania the constitution provided that no person holding office under the United States should exercise the office of judge. The recorder of Philadelphia had some judicial functions, and in *Respublica* v. *Dallas*, 3 Yeates, 300, 314, it was said that, in strict legal sense, he was a "judge," but that there was difficulty in determining what the constitution meant; and the court seems to have considered it a close question, but determined that the use of the word "judge" was with reference to officers known by that name in the law, and that it was not intended to include all who performed judicial duties.

Among other reasons for reaching this conclusion (and it is a cogent one) was the fact that, in the section under discussion, "not only some of the judicial characters, as justices of the peace, are omitted in the prohibition, but others, as registers of wills, although, as constituting a part of the register's court, they are declared to be part of the judicial power of the State, are particularly included in the prohibition, showing the sense of the convention that every person exercising judicial power was not intended to be included under the word 'judge;' otherwise it would have been nugatory to have expressly included the registers." It is plain that the decision does not aid us in determining whether city offices are held under the State, yet it is one of the cases relied on in support of respondent's contention. It is a case where a city office was held not to be included, but it was for reasons peculiar to the particular provisions of that constitution.

In *State* v. *Wilmington City Council*, 3 Har. (Del.) 294, the court passed on the following provision of the constitution, viz.: "No ordained clergyman or ordained preacher of the gospel, of any denomination, shall be capable of holding any civil office in this State, or of being a member of either branch of the legislature." The question arose over the office of city treasurer, and it was held not to be within the meaning of the provision. Here, again, some facts are found in connection with the Delaware constitution which render the decision of no great force upon the question we are discussing. One thing the opinion does show, viz., that local officers such as constables, overseers of the poor, and even attorneys at law, were State officers. We quote:

"Is this principle fully recognized in excluding clergymen from all offices connected with the government properly speaking, or does it require to be extended to offices held under public corporations, and not held under or composing any part of the State government? The business of the convention was to establish a State govern-

ment, and to provide the mode of its administration. In speaking of offices, such offices were undoubtedly meant as were designed for this purpose, either directly or indirectly. And the constitution is very particular in its details in reference to officers and the mode of their appointment, specifying election officers, officers relating to taxes, to the poor, and to highways, constables, and hundred officers. Even attorneys at law seem to have been .regarded as officers, being a part of the judicial branch of the government, and concerned in carrying out the system. For all these have their parts to perform, and without the agency of any, the most unimportant of them, the system would be imperfect. But the constitution nowhere descends to notice a corporation officer. Such an office forms no part of the system of government. It is perfectly immaterial, for all the purposes of State government,'whether the city of Wilmington has a treasurer or no treasurer; and, as the existence of such an officer did not enter into the system of government which the convention was forming, it cannot be supposed that the qualifications or disqualifications which they sought to apply to their officers were designed by them to be extended and applied to such corporate officer."

Other reasons arising out of and peculiar to the Delaware constitution are shown in the following quotation from the opinion:

"But if this office of city treasurer be an 'office' within the meaning of the constitution, the whole affair is wrong, and the people of Wilmington have no right to choose the person who shall fill that office. If this be a 'civil office in this State,' such an office as is embraced within the constitution, it is an office 'under this State,' and the appointment to it is, by the same constitution, vested in the government. Article 3, § 8: 'The governor shall appoint all officers whose offices are established by this constitution or shall be established by law, and whose appointments are not herein otherwise provided for.' This is an office established by law, and the appointment to it is not provided for in the constitution otherwise than by the general appointing power of the governor. If, therefore, it be a constitutional office, it must be filled by the governor's appointment."

This case clearly implies, if it does not expressly state, that the city treasurer of Wilmington has no functions of a State character, in the language quoted, which we repeat:

"For all these have their parts to perform, and without the agency of any, the most unimportant of them, the system would be imperfect. But the constitution nowhere descends to notice a corporation officer. Such an office forms no part of the system of government. It is perfectly immaterial, for all the purposes of State government, whether the city of Wilmington has a treasurer or no treasurer."

We may conclude what we have to say upon that case with the statement that the opinion refers to the case of *Respublica* v. *Dallas*, 3 Yeates, 300, as "in point, and on the same principle," upon the question of constitutional construction, *i. e.*, that the section is to be construed in the light of other provisions of the constitution. It will be noticed that in neither of these cases is there anything that militates against the proposition that a municipal officer *with State functions* is an officer under the State, or asserts that he is exempt from the provision because elected by a city or village.

But in the case of *Attorney General* v. *Connors*, 27 Fla. 329, may be found an instance where the supreme court of Florida holds that, while a sheriff is within the prohibition of one of these provisions because he is a State officer, a city marshal is not, because he holds under a city, and therefore not under the State. It seems to be put upon the ground that, inasmuch as the constitution left the legislature the power of creating and destroying municipal corporations, it cannot be supposed that they were understood to be a part of the State government, considered in its broad and comprehensive sense, although it admits that they are clothed with powers to be exercised outside of the confines of the municipality (and therefore with State powers), still "they are incidents, auxiliaries, and agencies only, in their relation to the States'

government." Again, county officers are distinguished upon the ground that they "are, in express terms, created and provided for by the constitution, as part of the machinery of the State's government in their respective counties, and are to be regarded, strictly speaking, as officers of the State." This case decides the question upon its own State constitution, and, were we to approve the reasoning (which we do not), might readily be distinguished from a case arising under our Constitution, where the incorporation and organization of cities and villages by the legislature are required (article 15, § 13); and by article 4, § 38, authority is given to confer powers of a local, legislative, and administrative character upon townships, cities, and villages. The latter provision has always been considered as authorizing the legislature to impose on municipalities and their officers the responsibility for the performance of State duties, of one character or another, and has never been supposed to mean only that it might confer privileges in which the State would have no interest. This could be done without this provision. Under it they have imposed duties pertaining to the public health and good order, and various other subjects of general concern. See *Davock* v. *Moore*, 105 Mich. 120, 132; *Friesner* v. *Common Council of Charlotte*, 91 Mich. 504. We are not impressed by the argument that, as these corporations and offices may be created and destroyed by the legislature, such offices are not held under the State. County and township, and, for that matter, State, offices, may be created and destroyed by the legislature at will, yet they are State offices.

In *Santo* v. *State*, 2 Iowa, 165, 220 (63 Am. Dec. 487), where the question was whether a mayor, who was given the criminal jurisdiction of a justice of the peace, had functions pertaining to two departments of government, viz., the executive and judicial, the court disposed of the question by the simple assertion:

"These departments are the departments of the government of the State of Iowa. The mayor of the city of

Keokuk is not a part of the government of the State of Iowa. He exercises none of the functions belonging to that department. Whatever executive offices he may perform pertain to him only as an officer of that corporation. But we do not mean to say that he is an executive officer, in any proper sense."

This case, it will be observed, deals with another provision, and involves the determination of what is meant by "departments of government." This question is discussed more at length in the case of *People* v. *Provines*, 34 Cal. 520, 538, where Sanderson, J., follows the Iowa case and that of *Uridias* v. *Morrill*, 22 Cal. 473, which last case, he says, is on all fours. The force of this opinion is lessened by the relation of the writer to the case of *People* v. *Sanderson*, 30 Cal. 160, where it was held that he could not perform duties pertaining to the office of trustee of the State library, which were given him by statute, because it would be exercising functions pertaining to two branches of government, and by the fact that Rhodes, J., dissented, expressing the opinion that the case overruled a series of decisions, continuous from *Burgoyne's Case*, in 1855. 5 Cal. 9. We shall discuss other cases, at war with this doctrine, upon other provisions of the Constitution; but the subject is not especially important, as the doctrine enunciated in the Iowa case would be applicable to county or township offices as well as city offices. It does not turn on the fact that the mayor was a city officer, but upon a restricted interpretation of the term "departments of government."

*Carpenter* v. *People*, 8 Colo. 116, arose upon the provision: "No senator or representative shall, during the term for which he shall have been elected, be appointed to any civil office under this State." The opinion says that *People* v. *Provines* and *Santo* v. *State* are decided upon similar constitutional provisions (which is manifestly otherwise), and are in point, and that they have no reason to doubt their soundness, but "prefer to rest the decision upon the plain words of the constitution; it only

prohibits appointment to a civil office, not election,"—and upon this ground alone eligibility was sustained.

*Britton* v. *Steber*, 62 Mo. 374, is a case upon which great reliance is placed; but, in the first place, it is based upon a different provision of the constitution, and, second, there is nothing to show that the mayor had any duties pertaining to the State. On the contrary, the opinion states that "there is a recognized distinction between State officers, whose duties concern the State at large or the general public, although exercised within defined territorial limits, and municipal officers, whose functions relate exclusively to the particular municipality." It is quite probable that if a municipal officer had duties pertaining only to the city's private affairs or property, as gas or water works, sewers, etc., respondent's contention would be correct, though the case of *State* v. *Valle*, 41 Mo. 29, quoted approvingly in the case last discussed, would seem to imply the contrary. That case goes the furthest of any that we have seen. The constitutional provision was:

" No senator or representative shall, during the term for which he shall have been elected, be appointed to any civil office under this State which shall have been created, or the emoluments of which shall have been increased, during his continuance in office as a senator or representative, except to such offices as shall be filled by election of the people."

A member of the house of representatives was appointed by the mayor as a member of the board of water commissioners of the city of St. Louis. The court held him ineligible, and discussed the question before us as follows:

" The government is the fountain of office, and civil officers have a right to exercise a public employment, and take the fees and emoluments thereunto belonging. 1 Bl. Comm. 272; 2 Bl. Comm. 36. A civil office is a grant and possession of the sovereign power, and the exercise of such power, within the limits prescribed by the law which

creates the office, constitutes the discharge of the duties of the office, and it is distinguished in this respect from a mere employment as a contractor or agent under some public office. *Opinion of Judges*, 3 Me. 481; *Com.* v. *Binns*, 17 Serg. & R. 219; *Lamson* v. *Sutherland*, 13 Vt. 309; *County of Yalabusha* v. *Carbry*, 3 Smedes & M. 529, 550. The legislature had the constitutional power to establish this board of commissioners as a part of the local administration of city affairs, and to appoint the officers, and to provide that they should be paid out of the city treasury; and, as a body constituted for purposes of civil government, they are unquestionably civil officers under this State. *People* v. *Draper*, 15 N. Y. 532; *Hamilton* v. *St. Louis County Court*, 15 Mo. 3; *Daley* v. *City of St. Paul*, 7 Minn. 390: In a certain popular acceptation, the words 'civil office under this State' might possibly be interpreted to mean State officers, in the sense of participating directly in the administration of the State government as such; but they are none the less civil officers under this State because their functions are confined to the local administration. The offices are created, and the officers are appointed, and their powers given, and their duties defined, and their salaries fixed, directly by act of the legislature. They exercise a share of the powers of civil government, and their authority comes directly from the State. They are to be considered as much civil officers under this State as the judge of a court or the mayor of the city. They would be none the less so if appointed by the mayor, for they would still derive all their powers from the act which creates the office. The mode of appointment is not material."

Bearing in mind the distinction made, viz., that immunity depends on the duties being only and purely municipal, we shall find that the Indiana cases are in harmony, and support the proposition that one having State functions is within the prohibition, though he be elected by the electors of the municipality. The earliest case was *Waldo* v. *Wallace*, 12 Ind. 569, and it was held that a mayor, being a judicial officer of the State, was therefore ineligible to the office of sheriff. In *Howard* v. *Shoemaker*, 35 Ind. 111, it was held that a mayor, who was a judicial officer, was ineligible to the office of prison

director; but it was not put upon that ground (only two of the four justices being willing so to hold, owing to his having been by statute relieved of his judicial duties), but the case turned on other functions of the mayor. The court said:

"Upon the other question, it is the opinion of a majority of the court that as the mayor of a city, under the act of 1867, has duties to perform, under the laws of the State, aside from those which are judicial and those of a purely municipal character, such as the taking and certifying of affidavits and depositions, the proof and acknowledgment of deeds and other instruments in writing, for which he is entitled to and may charge and receive fees, the office is a 'lucrative' one, within the meaning of section 9, art. 2, of the constitution of the State."

In *State* v. *Kirk*, 44 Ind. 401 (15 Am. Rep. 239), the office of councilman was held to be *"purely and wholly"* municipal in its character, and that such officer has no duties to perform under the general laws of the State, and he was held not to be prohibited from holding another office. It is significant that the opinion cites the case of *State* v. *Wilmington City Council*, 3 Har. (Del.) 294, as much in point. This case of *State* v. *Kirk* was followed in the case of a city clerk in *Mohan* v. *Jackson*, 52 Ind. 599, without discussion. *Foltz* v. *Kerlin*, 105 Ind. 221 (55 Am. Rep. 197), has been discussed. The matter is summed up in *Chambers* v. *State*, 127 Ind. 365, and the distinction shown to be generally recognized is clearly drawn. After discussing the various cases, the court continues:

"It must, therefore, be regarded as the settled law of this State that if an office is purely municipal, the officer not being charged with any duties under the laws of the State, he is not an 'officer,' within the meaning of the constitution; but if the officer be charged with any duties under the laws of the State, and for which he is entitled to compensation, the office is a 'lucrative office,' within the meaning of the constitution."

The recent case of *Montgomery* v. *State* (decided at the November, 1894, term of the supreme court of Ala-

bama), 107 Ala. 372, contains the latest review of this subject that we have met. The provision of the constitution is as follows: "No senator or representative shall, during the term for which he shall have been elected, be appointed to any civil office of profit under this State which shall have been created, or the emoluments of which shall have been increased, during such term, except such offices as may be filled by election of the people.' The office was that of judge of the police court of a city. The court quoted copiously from some of the cases hereinbefore cited, and held the office to be prohibited.

Some language used by this court in the case of *Miner* v. *Shiawassee County Supervisors*, 49 Mich. 604, is pertinent in showing its recognition of a State interest in local officers. The case arose over a question of costs upon a hearing upon charges preferred against a prosecuting attorney. The court said:

"When the particular office of prosecuting attorney is considered, no one will question that the county is greatly concerned in his being a man of integrity, because he is the official adviser of the county, and must represent it in litigation. But the State is concerned also, for he is the attorney for the State in all local prosecutions, and is relied upon to see to the local administration of public justice in its behalf. He is a local officer as respects his election and salary, but his duties to a large extent are local only in the sense that they are to be performed locally; for they are performed on behalf of the State just as much as are the duties of the judge who holds the courts for his county."

We have so far confined the discussion of the character of municipal officers to cases of constitutional disability to hold office. But the subject has arisen in many ways, and authorities are innumerable in support of the control of the State over municipal officers and their functions. In treating this subject, Mr. Dillon says (Dill. Mun. Corp. § 58):

"And here it is important to bear in mind the beforementioned distinction between State officers—that is,

officers whose duties concern the State at large, or the general public, although exercised within defined territorial limits — and municipal officers, whose functions relate exclusively to local concerns of the particular municipality. The administration of justice, the preservation of the public peace, and the like, although confided to local agencies, are essentially matters of public concern; while the enforcement of municipal by-laws proper, the establishment of gasworks, of waterworks, the construction of sewers, and the like, are matters which pertain to the municipality, as distinguished from the State at large."

Again, it is said in the same work, in a note to section 60, p. 102, that—

" The cases concur in holding that police officers are, in fact, State officers, and not municipal, although a particular city or town be taxed to pay them.   Cooley, Tax'n (2d Ed.), 681.   An act which makes the mayor and aldermen of a corporation commissioners of the courthouse and jail may be repealed by the legislature, and these buildings placed under the control of county or other officers. *State* v. *Mayor, etc., of City of Savannah,* R. M. Charlt. 250. See, also, *State* v. *Dews,* Id. 397.   A grant to a city to aid in building a courthouse and for educational purposes is subject, until executed, to legislative resumption and control.   *Bass* v. *Fontleroy,* 11 Tex. 698.   In the absence of constitutional restriction, the legislature may directly appoint officers to act within the municipality."

In *People* v. *Hurlbut,* 24 Mich. 81, Mr. Justice Campbell says:

" The only confusion existing on this subject has arisen from the custom prevalent under all free governments of localizing all matters of public management, as far as possible, and of making use of local corporate agencies whenever it can be done profitably, not only in local government, where it is required by clear constitutional provisions, but also for purposes of State.   Illustrations of this might easily be multiplied.   The whole system of State taxation, under our laws, is made to depend on the action of town and county officers, who make the assessments and collect most of the taxes.   And the whole machinery of civil and criminal justice has been so generally confided to local agencies that it is not strange if it has sometimes been considered as of local concern.

But there is a clear distinction in principle between what concerns the State and that which does not concern more than one locality; and, where the Constitution has made no rule for their management, affairs belonging to State policy must be subject to immediate State control, if the legislature shall deem it necessary."

In the same case Mr. Justice COOLEY said:

"For those classes of officers whose duties are general, such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called, provision has, to a greater or less extent, been made by State appointment. But these are more properly State than local officers; they perform duties for the State in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers, when the nature of their duties is essentially general. * * * The municipality, as an agent of government, is one thing; the corporation, as an owner of property, is in some particulars to be regarded in a very different light."

It yet remains to determine whether the office of mayor of Detroit has State functions, and, when the provisions of law bearing upon that question shall have been collected, it will leave no room for doubt. By the charter (Act No. 326, Local Acts 1883, chap. 5, § 1), the mayor is made a conservator of the peace, which, as has been already said, imposes a State duty, which he holds in common with all magistrates. 2 How. Stat. § 9264, imposes similar duties. It is as follows:

"If any persons, to the number of twelve or more, being armed with clubs or other dangerous weapons, or if any persons, to the number of thirty or more, whether armed or not, shall be unlawfully, riotously, or tumultuously assembled in any city, township, or village, it shall be the duty of the mayor and each of the aldermen of such city, the supervisor of such township, the president and each of the trustees or members of the common council of such village, and of every justice of the peace living in such city, township, or village, and also of the sheriff of the county and his deputies, to go among the

persons so assembled, or as near to them as may be with safety, and in the name of the people of this State to command all the persons so assembled immediately and peaceably to disperse."

This is made more emphatic by a provision making neglect or refusal to perform such duty punishable under the criminal laws of the State:

"If any mayor, alderman, supervisor, president, trustee, or member of a common council, justice of the peace, sheriff or deputy sheriff, having notice of any such riotous or tumultuous and unlawful assembly as is mentioned in this chapter, in the city, township, or village in which he lives, shall neglect or refuse immediately to proceed to the place of such assembly, or as near thereto as he can with safety, or shall omit or neglect to exercise the authority with which he is invested by this chapter for suppressing such riotous or unlawful assembly, and for arresting and securing the offenders, he shall be deemed guilty of a misdemeanor, and shall be punished by a fine not exceeding three hundred dollars." Section 9267.

Again, section 9435 authorizes the mayors of all cities to require persons to give security to keep the peace, and section 9454 *et seq.* authorizes them to conduct examinations of persons charged with crime, and commit them to jail, or require a recognizance for appearance at the circuit court for trial. Again, section 9479 authorizes mayors to admit persons charged with crime to bail. Section 9385 commands mayors to issue proclamations requiring saloons to be closed upon election days, and again emphasizes the State character of this requirement by making a violation of the section a misdemeanor, punishable by fine and imprisonment. Again, under 1 How. Stat. § 911, in cases of riot, breach of the peace, tumults, or violent resistance of any *process of this State*, it is within the power of the mayor to call upon the commanding officer for aid from State troops; and section 913 provides a punishment for officers who refuse to comply with the request. Again, mayors are made members of the boards of health. Section 1681. See,

also, section 42, chap. 7, of the charter, for authority of the council in relation to the preservation of the public health, and section 38 for authority as to drainage. And see Act No. 336, Local Acts 1883, which authorizes the mayor to nominate persons to fill vacancies upon the school board. This is under a general law, as is his veto power given by Act No. 394, Local Acts 1893, which was held constitutional in *Pingree* v. *Board of Education*, 99 Mich. 404. Again, the mayor may administer oaths (section 14, chap. 5, of the charter); and, under section 15, may hear complaints and annul or suspend licenses for violations of the ordinances, or any *other law of the State*. Other duties pertaining to State affairs might be mentioned, but these are perhaps the most significant, and are ample to show that the mayor of Detroit holds office under this State; and we think it beyond reasonable contention that this office is within article 5, § 15, prohibiting the execution of the office of governor by one holding it.

Are the offices of mayor of the city of Detroit and the governor of the State incompatible under common-law rules? It is the universal rule that, when such incompatibility exists, the acceptance of the latter office vacates the first. *State* v. *Goff*, 15 R. I. 505 (2 Am. St. Rep. 921), and authorities there cited. The authorities are in substantial agreement as to the rule of incompatibility, and Mechem states it as follows: "This incompatibility which shall operate to vacate the first office exists where the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for one person to retain both." Mechem, Pub. Off. § 422. In *State* v. *Goff* the test is thus stated:

"The test of incompatibility is the character and relation of the offices; as where one is subordinate to the other, and subject in some degree to its revisory power, or where the functions of the two offices are inherently inconsistent and repugnant. In such cases it has uniformly been held that the same person cannot hold both offices."

In *State* v. *Thompson*, 20 N. J. Law, 689, it is said:

"Where there is no express provision, the true test is whether the two offices are incompatible in their natures, in the rights, duties, or obligations connected with or flowing out of them. Offices, says Bacon, are incompatible or inconsistent when they cannot be executed by the same person; or when they cannot be executed with care and ability; or where one is subordinate to or interferes with another (Bac. Abr. tit. 'Office' K); or where one office is under the control of another (Com. Dig. tit. 'Office'). A town clerk, made mayor, and accepting the office, ceases to be town clerk, as the one office is subordinate to the other; and where a coroner is made sheriff he ceases to be coroner (Bac. Abr.). So, where a master in chancery is appointed chancellor, I apprehend he ceases to be master because the chancellor has a control over his masters."

The sole difficulty lies in the application of the rule, and in every case the question must be determined from an ascertainment of the duties imposed by law upon the two officers. If one has supervision over the other, or if one has the removal of the other, the incongruity of one person holding both offices is apparent, and the incompatibility must be held to exist so that the acceptance of the latter vacates the former. We have already referred to the provisions of the charter and the statute laws imposing duties upon the mayor. For the violation of some if not all of these, he might be removed from office by the governor under the statute hereinafter cited. Section 653, 1 How. Stat., provides that "the governor may remove all county officers chosen by the electors of any county or appointed by him, and shall also remove all justices of the peace and township officers chosen by the electors of any township, or city or village officers chosen by the electors of any city or village," etc. The Constitution, article 15, § 13, provides for the incorporation and organization of cities and villages by the legislature. Under this provision, the legislature possesses the power to provide for the creation, election, and removal of the municipal officers of cities and villages. Such has been

the universal practice under the Constitution. The Constitution, article 12, § 7, is as follows: "The legislature shall provide by law for the removal of any officer elected by a county, township, or school district in such manner and for such cause as to them shall seem just and proper." It is urged that this provision of the Constitution last quoted does not in express terms include the mayor, and that, therefore, no such power of removal exists. In *McLaughlin* v. *Burroughs*, 90 Mich. 311, proceedings were instituted for the removal of an alderman of the city of Detroit under the statute above cited. The proceedings were recognized as authorized under the latter provision of the Constitution above cited. The authority to institute the proceedings does not appear to have been questioned. This argument, carried to its logical conclusion, would result in holding that the legislature has no power to provide for the removal of any village or city officer, because, if there is no constitutional power to provide for the removal of a mayor, there is also no constitutional power to provide for the removal of any officer of a city. Chief Justice MCGRATH, in his opinion in *Davock* v. *Moore*, 105 Mich. 120, 148, said: "There is no doubt of the power to provide for the removal by the governor of any officer of any municipality in the discharge of whose functions the State has a special interest." The majority opinion was not in conflict with this statement. Counsel for the respondent appear to concede that the charter provisions for the removal of officers are valid. This concession concedes the power to provide for the removal of the mayor, and for authority for his removal we must look to the general statute of removals. This statute expressly includes the mayor, and is clearly authorized by the Constitution, whether it be based upon section 7, art. 12, or upon section 13, art. 15, which confers upon the legislature exclusive authority over the organization of cities and villages.

It is also urged that this general law is superseded by the charter of the city, because the latter provides for

the removal of other city officers, but not of the mayor. In other words, the mere silence of the charter operates as a repeal as to the office not mentioned as well as to those mentioned in it. If the charter had made provision for the removal of the mayor, there would be force in this contention that the latter superseded the former, but mere silence as to the removal of an officer does not operate to suspend or repeal a general law providing for such removal.

In *Rex* v. *Tizzard*, 9 Barn. & C. 418, it was held that the offices of alderman and town clerk were incompatible, and that one person could not hold both, and this for the reason that the mayor, aldermen, and bailiffs of the borough had the appointment of the clerk, the fixing of his salary, *and the power of removal.* This decision was largely based upon the power of removal. Lord Tenterden, C. J., said:

" The fifth replication shows that the common clerk has to attend corporate meetings, and take minutes of their proceedings. If that be not done faithfully, he may be amoved from his office, and upon that question he would have a vote in his character of alderman. Thus, then, he would fill the two incompatible situations of master and servant."

In the same case, Bayley, J., said that he thought two offices were incompatible where the holder could not, in every instance, discharge the duties of each; and in the two questions of amotion and salary the town clerk was not competent to discharge the duties of an alderman.

In *State* v. *Thompson, supra,* it was held that the offices of attorney general and prosecutor of the pleas were incompatible, although neither the constitution nor the statute prohibited it. In *Cotton* v. *Phillips,* 56 N. H. 220, the offices of prudential committee and auditor of a school district were held incompatible, because it was the duty of the auditor to examine the accounts of the prudential committee, and report whether they were properly cast and supported, and whether the money had been legally

expended.   The court said:   "If the same person could hold both offices, he would in fact sit in judgment on his own acts."   In *Stubbs* v. *Lee*, 64 Me. 195 (18 Am. Rep. 251), it was held that the defendant vacated the office of justice of the peace by being appointed to and assuming the functions of deputy sheriff, on account of the incompatibility of the two.

In *State* v. *Brown*, 5 R. I. 1, the defendant, a colonel of a regiment of the militia, was appointed to the office of major general, and it was held that his acceptance of that office vacated his colonelcy.   The language there used is also applicable to this case:

"Now, looking at the duties of the two offices in question, the legal compatibility of the two is hardly an arguable position. · For the same person to be commander and commanded,—to be superior and subordinate at the same time, above his brigadier in one capacity and below him in another,—contradicts every notion of military authority and discipline, unless, as the argument for the defendant supposes, when acting in his higher capacity he abandons his lower capacity, or *vice versa*."

In *State* v. *Buttz*, 9 S. C. 156, the question was whether the offices of State solicitor and member of Congress were incompatible.   Held, that they were, notwithstanding the provision of the constitution that "every person entitled to vote at any election shall be eligible to any office which now is or hereafter shall be elective by the people," etc.   See, also, *Pooler* v. *Reed*, 73 Me. 129.

If a superior officer is clothed with the power to remove from office an inferior officer, there is certainly no logic or reason in holding that one person may hold both.   No more marked incompatibility is possible.

The remoteness of the necessity for the removal of a mayor by the governor is urged by counsel for the respondent as a reason why a legal incompatibility does not exist at the common law.   The question, however, is one of the existence of the power, and not the remoteness of its exercise.   This position is well answered in

*State* v. *Goff, supra,* where it was urged that the respond-
ent would not probably undertake to act in both offices at
the same time:

"The admitted necessity of such a course is the strong-
est proof of the incompatibility of the two offices. The
question of incompatibility is to be determined from the
nature of the duties of the two offices, and not from a
possibility, or even a probability, that the defendant
might duly perform the duties of both." *State* v. *Brown,*
5 R. I. 1.

The power of removal is ever present, ready for use
when its exercise is required. The argument that the con-
tingency for its use is very remote is without force. We
have been unable to find a decision which holds that one per-
son may hold two offices, in one of which he is clothed
with power to remove the person holding the other It
follows that the offices of mayor and governor are incom-
patible.

In the course of these proceedings, reference has been
made, on behalf of respondent, to the alleged fact that
Mr. Pingree was elected to the office of governor after a
public declaration of an intention to continue to perform
the duties of the office of mayor, and it is intimated that a
result which ousts him from the office of mayor will have
the effect to disfranchise the people, and that such a result
is fraught with dangerous consequences. Were it not for
the eminence of counsel who present these considerations
to this court, we should hesitate about adverting to such
elementary principles as furnish an answer to these sug-
gestions and demonstrate their impropriety as well. Even
the power of majorities may be, and often is, restrained
by the written Constitution; and where the majority
assumes to do what is forbidden, or to do what is per-
mitted in a mode forbidden by the Constitution, the duty
of the court to protect the rights of minorities is too mani-
fest to require, at this day, either apology for its exercise
or an elucidation of its source of authority. If, in law,
the effect of the election of Mr. Pingree to, and his accept-

ance of, the office of governor operated to vacate the office of mayor, a court that would weigh majorities before so declaring would deserve impeachment and the contumely which would follow.

We have yet to consider the effect of the attempt to execute both offices. Mr. Pingree has taken the constitutional oath, and is in possession of the office of governor, and performing its duties. This section of the Constitution renders the two offices incompatible, as does the rule of the common law already discussed; and the general rule that the acceptance of a second vacates the first of two offices that are incompatible is not only the rule of the common law, but is held to apply to incompatibility growing out of constitutional provisions in several of the cases hereinbefore cited. See *People* v. *Sanderson*, 30 Cal. 160, 167; *People* v. *Provines*, 34 Cal. 520, 541; *Foltz* v. *Kerlin*, 105 Ind. 221 (55 Am. Rep. 197); *Dailey* v. *State*, 8 Blackf. 329; *Shell* v. *Cousins*, 77 Va. 328; also *Northway* v. *Sheridan*, 111 Mich. 18.

From what is said, it is obvious that the respondent should not have refused to call an election, and, in view of the fact that an election is to be held in Detroit on the 5th day of April next, it is desirable, upon the ground of economy, that this vacancy be filled at that time, if it can be legally done. Counsel seem to agree that seven days' notice of the special election to fill this vacancy is sufficient, and there is ample time to nominate candidates at conventions which have been already or can yet be called. It is conceded by counsel for the respondent that primaries for a special election may be held after the time specified in Act No. 411, Local Acts 1895, if there be time to print the ballots. We are therefore of the opinion that the election can be lawfully held at that time.

The writ will be granted as prayed, requiring the respondent to take all necessary steps to hold such election at the time named.

The other Justices concurred.