STATE, EX REL. NEBRASKA REPUBLICAN STATE CENTRAL COMMITTEE ET AL., APPELLEES, V. ADDISON WAIT, SECRETARY OF STATE, APPELLANT.

FILED NOVEMBER 1, 1912.   No. 17,841.

1. Elections: NOMINATIONS: POLITICAL PARTIES. Chapter 26, Comp. St. 1911, clearly recognizes the existence of political parties, and delegates to the members of each party the right to vote at primaries and general elections for candidates of their own party, nominated by themselves without the interference of members of any other political party.

2. ———: ———: PRESIDENTIAL ELECTORS. The preferential vote given by the voters of a political party at a primary election for a particular person as the party candidate for president, while morally binding upon the delegates of such party to the national convention, has no relation whatever to candidates nominated at such primary for presidential electors.

3. ———: ———: ———. Persons nominated by a political party at a primary election as candidates for presidential electors are nominated, not as electors to vote for any particular candidate then known, but to vote, if elected, for the persons who may subsequently be nominated by the national convention of such party as candidates for the offices of president and vice president.

4. ———: PRESIDENTIAL ELECTORS: VACANCY. It is a well-settled rule at common law that if a person, while occupying one office,

accepts another incompatible with the first, he, *ipso facto*, vacates the first office, and his title thereto is thereby terminated without any other act or proceeding.

5. ———: ———: ———. In such a case one of the tests of incompatibility is whether the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for the incumbent to retain both.

6. ———: ———: FILLING VACANCY. Where it appears that acts or events have occurred rendering an office vacant, the authority having the power to fill such vacancy may treat the office as vacant and proceed to elect or appoint, according to the form of law, another to fill it.

7. ———: RIGHTS OF VOTER: ENFORCEMENT. By the statutes of this state, every voter has the right, by a single cross, or by one manipulation of the lever of a voting machine, to vote a straight ticket for the candidates of his party; and it is the right of the governing body or committee of a political party to appeal to the court to enforce such right.

8. ———: POLITICAL PARTIES: GOVERNING BODY. Under the statutes of Nebraska, the national convention of a political party, or, when the convention is not in session, its national central committee is the supreme governing body of such party as to national affairs, and has full authority to decide which of rival conventions or committees in the state is the regular and duly authorized convention or committee of such party.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, ALBERT J. CORNISH and ·WILLARD ̇E. STEWART, JUDGES. *Affirmed.*

*Grant G. Martin, Attorney General, George W. Ayres* and *C. C. Flansburg,* for appellant.

*John L. Webster, A. W. Jefferis, Norris Brown, Aaron Wall, Amos Thomas* and *Frank M. Hall, contra.*

FAWCETT, J.

Appeal from a judgment of the district court for Lancaster county, awarding relators a peremptory writ of mandamus requiring the respondent to print upon the official ballot to be used at the general election in Novem-

ber, 1912, the names of certain persons as republican presidential electors.

This case was decided October 23, but for reasons well known to the parties the writing of the opinion was left to a later date. The intention of the writer, to whom the case fell in the regular course of-assignment of cases, was to write the opinion at his leisure; but upon consultation we all agreed that the writing of the opinion should be hastened, so that the reasons for our decision may be given to the public.

Article I, sec. 22, of the constitution of Nebraska provides: "All elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Article II, sec. 2, of the constitution of the United States provides for the election of presidential electors in each state, in such manner as the legislature thereof may direct, the number of electors to equal the number of the state's senators and representatives in congress. Article XII, sec. 1, provides that such electors shall meet in their respective states and vote by ballot for president and vice president, make lists of the number of persons voted for, the number of votes for each, and transmit such lists duly certified to the seat of government, directed to the president of the senate.

A large number of voters of Nebraska, regardless of party, having become dissatisfied with the old order of nominating candidates for office by delegate convention, determined, if possible, to change those conditions and secure the nomination of all officers, state, district, and county, by a direct vote of the people, and to that end secured, in 1907, the adoption of a primary law which provided for the nomination of such officers by the various political parties of the state in a state-wide primary. In 1909 the legislature conceived the idea of having an open primary, and amended the then existing law so that the members of one party might, without restraint, vote for the nomination of candidates for office in any other

party. One trial of that law satisfied all parties that it was wrong in principle, and the legislature of 1911 returned to the closed primary idea and enacted the primary and election law now in force. By the terms of that act, this case must be determined. The provisions of the law, as it now stands, will be found in chapter 26, Comp. St. 1911, and the references hereinafter made to certain sections of the law will, without so stating, be understood to be sections of that chapter.

Section 101: "Every civil office shall be vacant upon the happening of either of the following events at any time before the expiration of the term of such office, as follows: 1. The resignation of the incumbent. 2. His death. 3. His removal from office. 4. The decision of a competent tribunal declaring his office vacant. * * * 7. A forfeiture of office as provided by any law of the state."

Section 117$d$, subd. sec. 1$b$: "When candidates for offices of president and vice president of the United States are to be nominated, every qualified elector of a political party subject to this act shall have opportunity to vote his preference, on his party nominating ballot, for his choice for one person to be the candidate of his political party for president, and one person to be the candidate of his political party for vice president of the United States. * * * The names of any persons shall be so printed on said ballots solely on the petition of their political supporters in Nebraska, without such persons themselves signing any petition or acceptance. The names of persons in such political party who shall be presented by petition of their supporters to be party candidates for president and vice president of the United States, shall be printed on the nominating ballot, and the ballot shall be marked, and the votes shall be counted, canvassed and returned in like manner and under the same conditions as to names, petitions and other matters, as far as the same are applicable, as the names and petitions of aspirants for the party nominations for the office of governor

are now or may be by law required to be marked, filed," etc.

Section 117*f*: "In case a nomination shall be made by electors other than the candidate, said nominee shall within five days after the date said certificate shall be filed with the officer, file a statement in writing, duly verified under oath, stating that he affiliates with the party named in said certificate, that he will abide by the results of said primary, and if elected will qualify and serve as such officer. In case said statement shall not be filed within five days, the name of the candidate in the petition shall not be placed upon the primary ballot."

Section 117*r*: "Any qualified elector desiring to vote at any primary election held under the provisions of this act shall be entitled to participate in such primary election upon presenting himself at the polling place where he is entitled to vote; but he shall not be entitled to receive a primary ballot, or be entitled to vote at such primary election, until he shall have first stated to the judges of said primary election what political party he affiliates with."

Section 118*a*: "Vacancies occurring upon any party ticket after the holding of any primary shall be filled by a majority vote of the party committee of the city, district, county or state, as the case may be, and a certificate of such nomination shall be filed as required by section 5776 of Cobbey's Annotated Statutes, 1903."

Section 118*p*: "All certificates of nomination or nomination statements, which are in apparent conformity with the provisions of this act, shall be deemed to be valid, unless objections thereto shall be duly made in writing within three (3) days after the filing of the same. In case such objection is made, notice thereof shall forthwith be mailed to all candidates who may be affected thereby, addressed to them at their respective places of residence as given in the certificate of nomination or in the nomination affidavits of such persons, on file in that office. Objections to the use of party name may also be

made and passed upon in the same manner as objections to certificates and nomination statements. The officer with whom the original certificate was filed, or who made an affidavit to the original nominating statement, shall, in the first instance, pass upon the validity of such objection, and his decision shall be final, unless an order shall be made in the matter by a county court, or by a judge of the district court, or by a justice of the supreme court at chambers, on or before the second Wednesday preceding the election. Such order may be made summarily upon application of any party interested, and upon such notice as the court or judge may require."

Section 118q: "In case of a division of any party, the secretary of state shall give the preference of party name to the convention held at the time and place designated in the call of the regularly constituted party authorities, and if the other faction or factions shall present no other party name, the secretary of state shall select a name or title, and place the same on the ballots before the list of candidates of said faction. The action of the preceding national convention of such party, regularly called, shall determine the action of the secretary of state, or the court in its decision. The secretary of state may be compelled by peremptory order of mandamus proceedings to perform his duty in this regard."

Section 125r: "No voting machine shall be approved by the state board of voting machine commissioners unless it shall be so constructed as to insure every voter an opportunity to vote in secrecy; that each machine shall be so constructed as to provide facilities for voting for the candidates of at least seven parties or organizations; that a straight party ticket can be voted by the operation of a single device; * * * that the voter cannot cast more than one vote for any candidate, or vote for more than one person for the same office, unless he is lawfully entitled to vote for more than one person therefor, and in that event can vote for as many persons for that office as he is by law entitled to vote for, and no more; that the

names of the candidates for presidential electors need not appear on the ballot labels, but in lieu thereof, one ballot in each party column, or row, may contain only the words 'presidential electors' preceded by the party name, and the names of the candidates for president and vice president, and every vote registered for such ballot shall operate as a vote for all candidates of such party for presidential electors."

Section 140: "All official ballots prepared under the provisions of this act shall be white in color, six inches wide, and of a good quality of news printing paper, and the names shall be printed thereon in black ink. At the top and left side of the ballot shall be printed in black-faced capital type, not less than one-eighth of an inch high, the name of each party having candidates on the ballot; and to the right of each party name, a circle one-half inch in diameter, with leaders connecting the party name to the circle. Over the top circle shall appear the following printed instructions: 'To Vote a Straight Ticket Make a Cross Within Your Party Circle.' Every ballot shall further contain the name of every candidate whose nomination for any office specified in the ballot has been certified or filed according to the provisions of this act, and no other names and the name of no candidate shall appear on the ballot more than once."

That the legislature by the chapter above outlined has deliberately and clearly recognized the existence of political parties and attempted to delegate to the members of each party the right to vote at the primaries and at the general election for candidates of their own party, and nominated by themselves without interference of members of any other political party, is too clear to require discussion. In *State v. Drexel,* 74 Neb. 776, 786, Mr. Chief Justice HOLCOMB, speaking for this court, said: "It is quite true, we think, that when the legislature undertakes by laws of this character to regulate and control the internal affairs of political parties, and to determine the manner and method of making party nominations for

public offices, it must do so without discrimination and with equal consideration and benefit to all. But it is equally necessary to recognize the existence of political parties and to classify them by some convenient standard." In that opinion Judge Holcomb quotes with approval from *State v. Jensen*, 86 Minn. 19, as follows: "We are of the opinion that the legislature may classify political parties with reference to differences in party conditions and numerical strength, and prescribe how each class shall select its candidates; but it cannot do so arbitrarily, and confer upon one class important privileges and partisan advantages and deny them to another class, and hamper it with unfair and unnecessary burdens and restrictions in the selection of its candidates."

At the primary election in April last, the republican voters were given the opportunity to express their preference for the man whom they desired to have nominated as the candidate of the republican party for the office of president. By quite a large majority Theodore Roosevelt was named as such choice. The delegates also elected at that primary. to attend the republican national convention to convene in Chicago in June following were by that vote instructed to cast the solid vote of Nebraska for Mr. Roosevelt. Beyond the sitting of that convention and the nomination of a president and vice president by republican delegates of the nation there assembled, neither the duties of such delegates, nor the expression of a preference for Mr. Roosevelt by that primary, extended. The preferential vote given for Mr. Roosevelt had no relation whatever to the candidates nominated at that primary for presidential electors. It was not and could not at that time be known who would be the nominee of the national convention.

The candidates for presidential electors were nominated, not to vote for any particular candidate then known, but to vote, if elected at the November election, for the persons who might be nominated by the national convention as the candidates of the republican party for

the offices of president and vice president. At the primary election A. V. Pease, W. J. Broatch, George S. Flory, W. E. Thorne, A. R. Davis, Allen Johnson, Wesley T. Wilcox, and Alfred C. Kennedy were nominated as republican presidential electors for the state of Nebraska, to be voted for at the ensuing general election. In behalf of each of the eight persons so nominated, there had, prior to the primary, been filed with the secretary of state a petition, wherein it was represented: "We, the undersigned qualified electors of ——— County, in the state of Nebraska, affiliating with the republican party, hereby request that the name of (each of the gentlemen above named) be placed upon the official ballot of said party for the primary election to be held on the 19th day of April, 1912, as a candidate for the office of presidential elector at large." Each of the gentlemen named filed, over his respective signature, an acceptance of his nomination, as follows: "To the Honorable Secretary of State, Lincoln, Nebraska. Dear Sir: I hereby accept the nomination for the office of presidential elector at large on the republican ticket in accordance with petition filed in your office." By the acceptance of that nomination at the hands of persons "affiliating with the. republican party," they pledged themselves to discharge their duties, if elected, by voting for the candidates for president and vice president who should be subsequently nominated by the national convention of that party. We are all agreed that any other construction would be farcical.· When the national convention met in Chicago, it transpired that Mr. Roosevelt was not nominated as the candidate of the republican party for president, but that Mr. Taft became the nominee of that convention for president, and Mr. Sherman became the nominee for vice president. They thereby became the candidates of the republican party for those offices, and the gentlemen named, having been nominated as presidential electors upon the republican ticket, thereby became in honor bound to vote for such nominees.

24

After the adjournment of the republican national convention, a new national party was organized, to be known and designated as the "Progressive Party." At a national convention of that party, subsequently called, Mr. Roosevelt became the nominee of the party for president. Acting under the statutes of this state in that behalf, more than 500 legal voters, largely from the republican party, duly organized as a new party in this state under the said name of the progressive party. That convention indorsed the nomination of Mr. Roosevelt and the platform which had been adopted by its national convention in Chicago, which platform, it is conceded by all parties to this action, is in many respects in marked variance from the platform of the republican party. The state convention of that party nominated candidates for the various state offices, and also nominated eight presidential electors, six of whom were Messrs. Pease, Broatch, Flory, Thorne, Davis and Johnson. The six gentlemen named have not declined such nomination by the progressive party, but, on the contrary, by their conduct clearly show that it is their intention, if elected, to vote for the candidates of the progressive party, to wit, Mr. Roosevelt and Mr. Johnson for president and vice president, respectively. As an attempted justification of such action on their part, it was argued by counsel at the bar that, as about 80 per cent. of the republicans who voted at the April primary expressed their preference for Mr. Roosevelt as a candidate for president, the electors were thereby in effect instructed to vote for him at the November election, and that in the course they are pursuing they are simply carrying out those instructions. It was also said there is no proof in the record that either of these gentlemen has declared an intention to vote for Mr. Roosevelt. In this counsel are in error; but, if proof from witnesses were lacking, the above declaration by counsel at the bar clearly establishes the allegation of the relator that such is their determination.

It is contended by relator that, by this action on the

part of the gentlemen named, the office of each as a candidate upon the republican ticket for presidential elector became vacant, and his right to remain upon the republican ticket as a candidate for presidential elector became forfeited as effectually as if he had resigned therefrom. We are all agreed that this contention is not only founded upon high moral grounds, but is also supported by the clear current of authorities. While a nomination as a candidate for election to an office does not make the nominee, strictly speaking, an officer, he is in his relation to the party which placed its confidence in him a *quasi* officer, and his duties are to be measured by that relation.

In *State v. Anderson*, 136 N. W. (Ia.) 128, it is said: "In *Bryan v. Cattell*, 15 Ia. 538, this court held that, in determining whether a vacancy exists in an office, we are not confined to statutory causes, but may declare it vacant if it is incompatible with the office held. It is a well-settled rule of common law that if a person, while occupying one office, accepts another incompatible with the first, he *ipso facto* vacates the first office, 'and his title thereto is thereby terminated without any other act or proceeding.' (Citing numerous cases.) The principal difficulty that has confronted the courts in cases of this kind has been to determine what constitutes incompatibility of offices, and the consensus of judicial opinion seems to be that the question must be determined largely from a consideration of the duties of each, having, in so doing, a due regard for the public interest. It is generally said that incompatibility does not depend upon the incidents of the office, as upon physical inability to be engaged in the duties of both at the same time. *Bryan v. Cattel, supra*. But that the test of incompatibility is whether there is an inconsistency in the functions of the two, as where one is subordinate to the other 'and subject in some degree to its revisory power,' or where the duties of the two offices 'are inherently inconsistent and repugnant.' (Citing cases.) A still different definition has been adopted by several courts. It is held that in-

compatibility in office exists 'where the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for an incumbent to retain both.' (Citing numerous cases.)"

In the notes to *Attorney General v. Oakman*, 86 Am. St. Rep. 574, 578 (126 Mich. 717) it is said: "The rule is well settled at common law that if a person, while occupying one office, accepts another incompatible with the first, he, *ipso facto*, vacates the first office, and his title thereto is thereby terminated without any other act or proceeding. (Citing numerous cases.) * * * The public has a right to know which office is held and which surrendered. It should not be left to chance, or to the uncertain whim of the office-holder to determine. The general rule, therefore, that the acceptance of and qualification for an office incompatible with one then held is a resignation of the former, is one certain and reliable, as well as one indispensable for the protection of the public. (Citing cases.)"

In *State v. Goff*, 15 R. I. 505, it is held: "An officeholder accepting a second office incompatible with the first vacates his first office." In the opinion it is said: "It is well settled that, when a person accepts an office incompatible with one which he then holds, he thereby impliedly resigns or vacates his former office."

In *Attorney General v. Common Council*, 112 Mich. 145, 168, it is held: "A person who, while occupying one office, accepts another incompatible with the first, *ipso facto* vacates the first office." In the opinion it is said: "It is the universal rule that, when such incompatibility exists, the acceptance of the latter office vacates the first. *State v. Goff*, 15 R. I. 505, 2 Am. St. Rep. 921, and authorities there cited. The authorities are in substantial agreement as to the rule of incompatibility, and Mechem states it as follows: 'This incompatibility which shall operate to vacate the first office exists where the nature and duties of the two offices are such as to render it improper, from considerations of public policy, for one person to retain both.' "

The situation presented in the case at bar is more than one of mere incompatibility. Here the persons who have been nominated as presidential electors, having, if elected, but a single duty to perform, viz., to vote for the candidates nominated by the party by whose votes they were themselves nominated, openly declare that they will not perform that duty, but will vote for the candidates of another and distinctly antagonistic party. This would make performance of their duty impossible, and a judicial determination of the existence of a vacancy was, therefore, unnecessary. The candidates had, by their own acts, vacated their places as republican presidential electors. This action on their part *ipso facto* created six vacancies on the republican ticket for electors. These vacancies the duly recognized republican state central committee had a right to fill, and its action in that behalf is binding, not only on the secretary of state, but on the court as well.

In *Prather v. Hart,* 17 Neb. 598, we held: "Where it appears *prima facie* that acts or events have occurred subjecting an office to a judicial declaration of being vacant, the authority having the power to fill such vacancy, supposing the office to be vacant, may proceed, before procuring a judicial declaration of the vacancy, to appoint or elect, according to the form of law, a person to fill it."

In *Bell v. Templin,* 26 Neb. 249, Judge MAXWELL said: "A tribunal to determine contested elections need not be, strictly speaking, a judicial body, the powers exercised being *quasi* political and administrative."

In *State v. Drexel,* 74 Neb. 776, 788, the following language by Mr. Chief Justice HOLCOMB is instructive: "By section 19 of the act the right of an elector to vote at a primary is made to depend upon his political affiliation with the party for whose candidates he desires to cast a ballot. It is therein provided that no person shall 'be entitled to vote at such primary election until he shall have first stated to the judges of said primary election

what political party he affiliates with, and whose candidates he supported at the last election, and whose candidates he intends to support at the next election.' Provisions are also made for challenging any person offering to vote at such primary election, and for his making oath to the truth of the statements above required as to party affiliation and his support of candidates of the party with whom he is offering to vote. It is difficult to perceive any valid objection to provisions of this character, when applied to a primary election law. These laws replace party nominating conventions. The regulation of the membership of the party and of the right to participate in the nomination of its candidates, in this respect, is taken from the party and placed in the control of the legislature. The integrity of the party and the success of its principles and policies can be best maintained by the participation in its affairs of those only who are at heart in sympathy with the objects and ends to be attained by the organization, and loyal to its tenets. An indiscriminate right to vote at a primary would tend, in many instances, to thwart the purposes of the organization and destroy the party. A hindrance to one, not a member of a party, from participating in the selection of the party's delegates and candidates can in no proper sense be said to interfere with the free exercise of the elective franchise as guaranteed by the constitution. All that is required is that the party offering to vote at the primary, in order to be entitled to vote with either of the parties engaged in nominating candidates thereat, shall have affiliated with such party, supported its candidates generally at the last election, and intend to do so at the next. Open declaration of allegiance to party is absolutely essential to the proper working of any primary law. 'By his mere offer to vote for delegates to a convention of any party, the elector does, in effect, declare his intention to support the nominees of such convention, and the oath is provided for as a guaranty of the truth of the declaration already made by such offer to vote.'

*Rebstock v. Superior Court,* 146 Cal. 308, 316, 80 Pac. 65."

When the republican state convention assembled in July, it was found to be antagonistic to the nominees of the national convention. Therefore a considerable minority of the delegates withdrew, assembled in another room, organized as a convention, indorsed the nominees of the national convention, and selected a state central committee. A like committee was also selected by the first convention. The central committee of the second convention set actively to work for the nominees of the national convention, while the other committee devoted its energies exclusively to the republican state ticket. The republican national committee on September 18, by unanimous vote, resolved that the second convention noted "be and is hereby recognized by the national republican committee as the regular republican organization of the state of Nebraska;" and "that the republican state central committee, of which Hon. F. M. Currie is chairman, and appointed by the said republican state convention, be and is hereby recognized as the regular republican state central committee of the state of Nebraska." On September 11 the Taft committee, as we may term it, met and adopted a preamble and resolutions declaring that the six electors, Pease, Broatch, Flory, Thorne, Davis, and Johnson, had, since the holding of the primary, declared their intentions, respectively, if elected as presidential electors, to vote for the nominees of the progressive party for president and vice president, and had thereby repudiated their allegiance to the republican party, repudiated and revoked the certificate of their nomination filed with the secretary of state, repudiated their acceptance of said nomination, and had betrayed their trust as republican presidential electors; therefore it was resolved that their right to "remain candidates for presidential electors on the republican ticket has become forfeited, and is terminated and vacated." At a later meeting, on September 24, the committee nominated C.

F. Reavis, George D. Smith, W. H. Kilpatrick, O. A. Abbott, Daniel B. Jenckes, and Vac Buresh as presidential electors in place of Pease, Broatch, Flory, Thorne, Davis, and Johnson. On October 9 they presented to respondent, secretary of state, a petition· and certificate of nomination, in which it was recited that Pease and others had forfeited and vacated their right to appear upon the ballots at the November election as republican presidential electors; that by reason of the premises six vacancies existed in the list of republican presidential electors; that the committee had so declared, and had nominated Reavis and others to fill such vacancies; and demanded that their names be, by the secretary, printed on the ballots for the November election as republican presidential electors. The preambles and resolutions of the two meetings of the committee were attached to and made a part of their petition and certificate. No written objections to the certificate of nominations to fill. vacancies filed by the committee were filed with the secretary of state, in the manner and within the time required by section 118*p*, *supra*. The right, therefore, of the committee to act in the premises is not questioned. Their demand was refused by the secretary of state, whereupon relators applied to the district court for Lancaster county for a writ of mandamus to compel him to print the names of the persons so nominated by the committee upon the official ballot as republican presidential electors. On a hearing before the three judges of that court, a writ was awarded as prayed. We are now asked to reverse that judgment.

At the time the electors were nominated at the April primary, there were but two parties which could hope to succeed in electing a presidential ticket at the November election. Since the holding of the primary and since the national conventions of these two parties, the progressive party has been organized, and is now competing with the republican and democratic parties for the election of its candidates for president and vice president, with the

hope, and possibility, of its succeeding in so doing.   We
have recognized that party in *Morrissey v. Wait, ante,* p.
271.   The progressive party therefore now has the same
legal status before the voters of this state as either of the
other two parties.   Any voter who desires to cast his
vote for Mr. Roosevelt for president and for the other
nominees of the progressive party may do so by making a
cross in the party circle of that party in precincts where
the voting machine is not used, and by a single manipu-
lation of the lever of the voting machine where such ma-
chines are used.   A voter who desires to vote for the can-
didates of the democratic party may register his vote in
the same manner.   But, if the decision of the respondent
be sustained, no voter can so vote for the candidates upon
the republican ticket.   By far the greater number of vot-
ers do not know the various candidates for electors, but
they do know for whom they want to vote for president
and vice president.   They have been in the habit in the
past of voting a straight ticket, and particularly so for
presidential electors.   It is rare indeed that a voter
"scratches" that part of his ticket.   He votes for entire-
strangers about whom he has never read, or made in-
quiry, because of the fact that they stand for the candi-
dates whose election he desires.   To deprive the voters
who desire to vote a straight republican ticket of the
opportunity of doing so, and at the same time afford such
opportunity to the voters of the other parties named,
would be repugnant to every sense of honor, and would
be in defiance of the just rule that important privileges
and partisan advantages cannot be conferred upon one
class and denied to another class by hampering it with
unfair and unnecessary burdens and restrictions.

The right of every voter, by a single cross or by one
manipulation of the lever of a voting machine, to vote a
straight ticket for the candidates of his party is guar-
anteed by sections 125r and 140, *supra*.   Any attempt, by
deception or otherwise, to deprive him of that right is a
violation of both the letter and spirit of our laws.   If

such an attempt is made, it is the right of the governing body or committee of his party to appeal to the courts, if necessary, to protect him; and, when it is made to appear that such an attempt is intended, it is the duty of the court to prevent it. To permit the names of the six electors, who will not vote for the candidates of the republican party for president and vice president, but will vote for the candidates of another and different party, to be printed upon the official ballot as republican electors would be a gross deception, and would, without the possibility of a doubt, cause thousands of voters in this state to cast their votes for president and vice president for candidates other than their choice, and other than the candidates for whom it is their desire to vote. We cannot permit this to be done.

The judgment of the district court is therefore

AFFIRMED.