DENNIS J. FLYNN, Corporation Counsel, Racine County
Racine County has entered into an agreement with Kenosha County and Walworth County for participation to form a Tri-County Comprehensive Employment and Training Act Consortium. Under the program the Consortium will receive substantial federal funds for manpower training and education. Article 5.02 of the Consortium Agreement provides that the Consortium Policy Board shall be composed of six members. Each County Board shall appoint two members of their respective board to serve on the Policy Board. The Policy Board, subject to the federal law, is to decide if and when CETA funds should be allocated or reallocated to public agencies including vocational and technical educational schools, private agencies, including corporations, and individuals who participate in the programs.
You state that approximately $1.6 million are available for manpower programs and that Gateway Technical Institute will probably receive a substantial portion of this amount although there will be other competitors for the funds. Gateway Technical Institute serves the same three counties covered by the manpower Consortium. The Walworth County Board has appointed one of its supervisors to serve on the Policy Board who is also President, without compensation, of the Gateway Technical Institute governing board. He is entitled to reimbursement for expenses. *Page 454 
You inquire whether there is incompatibility of offices or other conflict of interest which would make such supervisor ineligible to serve on the Policy Board of the Consortium.
A county board supervisor is a county officer. Sec. 59.03 (3) (d), as renumbered by ch. 118, Laws of 1973. A member of a district board in charge of a vocational, technical and adult education school is a public officer. 60 OAG 178 (1971). Gateway Technical Institute is such a school. I am of the opinion that a member of a district board referred to in secs. 38.01 (2), 38.08, Stats., is not a county officer. The court approached but did not determine that issue in Village of West Milwaukee v. Area Boardof VTAE (1971), 51 Wis.2d 356, 387, 187 N.W.2d 387, appeal dismissed 404 U.S. 981, 92 S.Ct. 452, 30 L.Ed.2d 364.
Section 38.08 (1) (a), (4), Stats., provides:
 "(1) (a) A district board shall administer the district and shall be composed of 7 members who are residents of the district, including 2 employers who have power to employ and discharge, 2 employes who do not have power to employ or discharge, 2 additional members and a school district administrator of a school district which lies within the district. The school district administrator shall be appointed by the other 6 members.
"***
 "(4) District board members shall receive their actual and necessary expenses incurred in the performance of their duties."
Section 38.10 (1) (b), Stats., provides:
 "(1) (b) If the petition for creation of a district was filed by the governing bodies of counties or any combination of school districts, counties and municipalities, the county board chairmen of counties having territory within the district shall constitute the appointment committee."
I am of the opinion that the offices of county board supervisor and member of a district board of a VTAE school are not incompatible. In 19 OAG 609 (1930), it was stated that the offices of alderman and member of a local vocational board were incompatible since the local board reported the amount of funds needed to the municipality and *Page 455 
the city council levied and collected the tax. Power of levy with respect to district VTAE schools is now in the district and the county board has little to do with the functioning operations carried on by the district VTAE school. A county board can petition the state board for detachment from a district and attachment to another district. Sec. 38.06 (1), Stats.
Assuming for the present that the counties involved have power to enter into the joint agreement to form a Consortium, we must now consider the legal standing of the Policy Board provided for by the agreement. The word Consortium is not contained in ch. 59, Stats., or otherwise in the statutes as far as I have been able to ascertain. It was apparently used because it appears in rules promulgated by the U.S. Secretary of Labor to implement the Comprehensive Manpower Program. See sec. 95.3, Federal Register, Vol. 39, No. 108, June 4, 1974.
Section 66.30 (2), Stats., provides for intergovernmental cooperation between units of government including counties "for the receipt or furnishing of services or the joint exercise of any power or duty required or authorized by statute." Where sec. 66.30, Stats., is applicable, counties may create a commission by contract. The counties here involved have attempted to do this in the creation of the Policy Board. It is my opinion that the Policy Board is a commission which is not a separate legal entity but is an agency of the three counties. Neither sec. 66.30, Stats., nor the federal act involved require that Policy Board members be county board supervisors. Since commissioners are in effect county officers, county board members would be ineligible to act were it not for the provisions of secs. 59.06 and 59.025 (3) (a), (c), Stats., as created by ch. 118, Laws of 1973, since sec. 59.03 (4), Stats., as renumbered by ch. 118, Laws of 1973, provides:
 "(4) COMPATIBILITY. No county officer or employe is eligible to the office of supervisor, but a supervisor may also be a member of a town board, the common council of his city or the board of trustees of his village."
I am of the opinion that sec. 59.06, Stats., relating to the power of the county board to create special committees and sec. 59.025 (3) (a), (c), Stats., would permit county board supervisors to serve on *Page 456 
such a Policy Board in spite of the language of sec. 66.11 (2), Stats., which provides in part:
 "(2) Eligibility of other officers. Except as expressly authorized by statute, no member of a town, village or county board, or city council shall, during the term for which he is elected, be eligible for any office or position which during such term has been created by, or the selection to which is vested in, such board or council, but such member shall be eligible for any elective office. The governing body may be represented on city or village boards and commissions where no additional remuneration is paid such representatives and may fix the tenure of such representatives notwithstanding any other statutory provision. . . ."
It is noted that the exception in sec. 66.11 (2), Stats., which permits the governing body to be represented on commissions does not include county boards or commissions. Participation would be permissible under the "except as expressly authorized by law" exception since sec. 59.06, Stats., permits county boards to create committees of county board members for special purposes and sec. 59.025 (3) (a), (c), Stats., provides:
 "(3) CREATION OF OFFICES. Except for the offices of supervisor, judge, county executive and county assessor and those officers elected under section 4 of article VI of the constitution, the county board may:
 "(a) Create any county office, department, committee, board, commission, position or employment it deems necessary to administer functions authorized by the legislature.
"***
 "(c) Transfer some or all functions, duties, responsibilities and privileges of any county office, department, committee, board, commission, position or employment to any other agency including a committee of the board."
I am of the opinion that the office of Commissioner on a Policy Board of a Consortium whose function is to determine which, when and how much educational facilities within the three counties shall receive funds under the Comprehensive Employment and Training *Page 457 
Act and the unsalaried but expense reimbursable office of President of the governing body of a district vocational, technical and adult education school, which is an applicant competitor for such funds, are incompatible by reason of common law rules of incompatibility.
In Martin v. Smith (1941), 239 Wis. 314, 326, 1 N.W.2d 163, it is stated:
 ". . . at common law where the nature and duties of two offices were such as to render it improper from considerations of public policy for one person to discharge the duties of both, a person could hold but one; that if one holding a public office accepts another incompatible with the one which he holds, he thereby vacates the first office. State ex rel. Nebraska Rep. State C. Com. v. Wait
(1912), 92 Neb. 313, 138 N.W. 159, 43 L.R.A. (N.S.) 282, 291, and cases cited. Sec. 13, art. XIV, of the constitution continues the common law in force in the territory of Wisconsin at the time of its adoption so far as it is not inconsistent with the provisions of the constitution."
These matters are discussed in 37 OAG 624 (1948), 44 OAG 159 (1955) and 55 OAG 59 (1966).
In Woodhull v. Manahan (1964), 85 N.J. Super 157, 204 A.2d 212, affd. 43 N.J. 445, 205 A.2d 441, it was held that a town attorney could not sit on the county board of taxation. The court relied on the extensive treatment given to the problem of incompatible offices in Jones v. MacDonald (1960), 33 N.J. 132, 162 A.2d 817, in which it was held that a city councilman could not sit on the county board of taxation, in part because the county board would likely review cases in which the municipality had a direct or indirect interest. The court stated that subordination of one office to another clearly evidences incompatibility of those offices even if less than complete, but that the doctrine of incompatibility is not limited to instances of subordination; it is enough that conflict of duties may arise in the regular operation of the statutory plan.
In 3 McQuillin, Municipal Corporations, 3rd Ed. Revised, sec. 12.67, Incompatible offices, pp. 294-299, some of the grounds for incompatibility are discussed:
 ". . . Public policy demands that an officeholder discharge his duties with undivided loyalty. The doctrine of incompatibility is *Page 458 
intended to assure performance of that quality. Its applicability does not turn upon the integrity of the person concerned or his individual capacity to achieve impartiality . . . The doctrine applies inexorably if the offices come within it, no matter how worthy the officer's purpose or extraordinary his talent. . . . this common-law rule is sometimes buttressed and sometimes qualified by statutory provision. They should be construed together so far as possible. . . . At common law, offices were not incompatible unless the functions were inconsistent. . . . While incompatibility has been described as physical impossibility to perform the duties of both offices, it is not simply a physical impossibility to discharge the duties of both offices at the same time, it is an inconsistency in the functions of the two offices, as where one is subordinate to the other, or where a contrariety and antagonism would result in the attempt by one person to discharge faithfully and impartially the duties of both. Two offices are said to be incompatible when the holder cannot in every instance discharge the duties of each. Incompatibility arises, therefore, from the nature of the duties of the offices, when there is an inconsistency in the functions of the two, where the functions of the two are inherently inconsistent or repugnant, as where antagonism would result in the attempt by one person to discharge the duties of both offices, or where the nature and duties of the two offices are such as to render it improper from considerations of public policy for one person to retain both. The true test is whether the two offices are incompatible in their natures, in the rights, duties or obligations connected with or flowing from them. . . ."
It is doubtful whether such President would have a private pecuniary interest in any public contract, direct or indirect, which would involve the criminal statute, sec. 946.13, Stats. However, under well-settled principles of the common law, public policy requires that an office holder discharge his duties with individual loyalty. In the instant case, the President of the Gateway Technical Institute would be participating in the application for substantial funds to be allocated or reallocated by the Policy Board of the Consortium and at the same time would be acting as a member of the Policy Board in the allocation of such sums. *Page 459 
Although I have answered your question as to compatibility of offices assuming that the counties have power to enter into the Consortium for the purposes stated, it is incumbent that the question of county power be examined.
I am of the opinion that the counties involved did not have power to enter into the Consortium under the facts stated. It is probable that the Governor could designate counties as municipal units of government to act as prime sponsors, under the federal act referred to, to carry out specific duties required by the act.
The Comprehensive Employment and Training Programs Act, Pub. Law 93-203, became law December 28, 1973, and appears at 29 U.S.C.A. 801-992.
The program description for the Comprehensive Manpower Services portion of the act is set forth in sec. 811 as follows:
"Sec. 811. Program description
 "It is the purpose of this subchapter to establish a program to provide comprehensive manpower services throughout the Nation. Such program shall include the development and creation of job opportunities and the training, education, and other services needed to enable individuals to secure and retain employment at their maximum capacity. Comprehensive manpower services may include, but shall not be limited to, programs and activities designed to carry out the purpose of this subchapter, such as-
 "(1) outreach to make persons aware of the availability of manpower services and persuade them to use such services,
 "(2) assessment of the individual's needs, interests, and potential in the labor market and referral to appropriate employment, training, or other opportunities,
 "(3) orientation, counseling, education, and institutional skill training to prepare the individual to enter the labor market or to qualify for more productive job opportunities,
"(4) training on the job, *Page 460 
 "(5) payments or other inducements to public or private employers to expand job opportunities, but payments to employers organized for profit shall not exceed the difference between the costs of recruiting, training, and providing supportive services for low income persons and those regularly employed,
 "(6) services to individuals to enable them to retain employment,
 "(7) payment of allowances to persons in training for which they receive no remuneration and payment of such allowances for transportation, subsistence, or other expenses incurred in participating in manpower services or employment as are necessary to enable the individual to participate therein,
 "(8) supportive services to enable individuals to take advantage of employment opportunities, including necessary health care and medical services, child care, residential support, assistance in securing bonds, or any other necessary assistance incident to employment, and any other service needed to participate in employment or manpower services,
 "(9) development of information concerning the labor market and activities, such as job restructuring, to make it more responsive to objectives of the manpower services program,
 "(10) manpower training, employment opportunities, and related services conducted by community-based organizations,
 "(11) transitional public service employment programs, and
 "(12) any programs authorized by part A of subchapter III of this chapter and by subchapter IV of this chapter."
The purpose of the Public Service Employment Programs portion of the act is set forth in sec. 841 as follows: *Page 461 
"Sec. 841. Congressional statement of purpose
 "It is the purpose of this subchapter to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services in areas of substantial unemployment and, wherever feasible, related training and manpower services to enable such persons to move into employment or training not supported under this subchapter."
Part A of subch. III of the act is concerned with providing additional manpower services for youth, offenders, persons of limited English-speaking ability, veterans, Indians and Alaskan natives, older workers and others who are disadvantaged.
Subchapter IV of the act is concerned with a Job Corps of low-income disadvantaged young men and women and authorizes residential and nonresidential centers in which enrollees will participate in programs of education, vocational training work experience, counseling and other activities. Section 918 (b) provides that education and vocational training may be through local public or private educational agencies, vocational educational institutions or technical institutes. Section 919 (a) provides that enrollees may be provided with personal, travel and leave allowances, quarters, subsistence, transportation, equipment, clothing, recreational services and other expenses.
Section 812 (a) (1) (b) provides that a state may be a prime sponsor only if local units of government or combinations thereof have not submitted timely applications. A prime sponsor other than the state is a local unit of government, or combination of local units, having a population of 100,000.
Section 981 (a) (10), provides:
 "(10) `Unit of general local government' means any city, municipality, county, town, township, parish, village or other general purpose political subdivision which has the power to levy taxes and spend funds, as well as general corporate and police powers."
Wisconsin counties probably qualify within the definition although there is a question whether they do in fact have "general" corporate and police powers. *Page 462 
Section 59.01 (1), Stats., provides that:
 "(1) Status. Each county in this state is a body corporate, empowered to sue and be sued, to acquire and hold, lease or rent real and personal estate for public uses or purposes, including lands sold for taxes, to sell, lease and convey the same, including the authority to enter into leases or contracts with the state for a period of years for the uses and purposes specified in s. 23.09
(2) (d), to make such contracts and to do such other acts as are necessary and proper to the exercise of the powers and privileges granted and the performance of the legal duties charged upon it."
Section 59.02 (1), Stats., provides:
 "(1) The powers of a county as a body corporate can only be exercised by the board thereof, or in pursuance of a resolution or ordinance adopted by it."
Counties are quasi-municipal corporations. They are governmental arms of the state and can exercise only those powers specifically conferred on them by statute or necessarily implied.Spaulding v. Wood County (1935), 218 Wis. 224, 260 N.W. 473;Maier v. Racine County (1957), 1 Wis.2d 384, 84 N.W.2d 76.
Article IV, sec. 22, Wis. Const., provides:
 "Powers of county boards. The legislature may confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative and administrative character as they shall from time to time prescribe."
Only the Wisconsin Legislature can confer powers on county boards. Such powers cannot be conferred by the congress except where the legislature has authorized counties to act pursuant to federally enacted legislation.
Under sec. 66.30, Stats., counties can enter into cooperation agreements to carry out functions jointly. However, the furnishing of services or joint exercise of power is limited to "any power or duty required or authorized by statute." (Emphasis added.) Sec. 66.30 (2), Stats. *Page 463 
Section 66.30, Stats., does not refer to contracts with the federal government. Even where sec. 66.30, Stats., is applicable, each governmental unit must have independent power to carry out the services or functions involved.
The legislature has not specifically authorized counties to carry out the provisions of the federal act referred to. The legislature has provided county power with respect to cooperation under other federal laws. See sec. 66.433, Stats., relative community relations-social development commissions.
Without question a county has power to engage in some of the activities contemplated under the federal act. Section 59.07
(17), Stats., permits the county to accept "grants for any public governmental purpose within the powers of the county." (Emphasis added.) Section 59.07 (95), Stats., permits the county to appropriate money for "educational" programs concerned with music or visual arts. The county has broad powers of employment for county purposes under sec. 59.15, Stats. There are other statutes which would permit the county to engage in some of the function contemplated by the federal act. Counties, unlike cities and villages, have no broad home rule powers such as those set forth in sec. 66.11 (5), Stats., and Art XI, sec. 3, Wis. Const. I am of the opinion that sec. 59.07 (5), Stats., does not provide adequate power for the purposes involved since power granted county boards is limited by the phrase underlined. Section 59.07
(5), Stats., provides:
 "(5) General authority. Represent the county, have the management of the business and concerns of the county in all cases where no other provision is made, apportion and levy taxes and appropriate money to carry into effect any of its powers and duties." (Emphasis added.)
An avenue is available to counties and groups of counties to qualify as prime sponsors under the federal act. Section 16.54
(1), (6), Stats., provides:
 "(1) Whenever the United States government shall make available funds for the education, the promotion of health, the relief of indigency, the promotion of agriculture or for any other *Page 464 
purpose other than the administration of the tribal or any individual funds of Wisconsin Indians, the governor on behalf of the state is authorized to accept the funds so made available. In exercising the authority herein conferred, the governor may stipulate as a condition of the acceptance of the act of congress by this state such conditions as in his discretion may be necessary to safeguard the interests of this state.
 "(6) The governor may accept for the state the provisions of any act of congress whereby funds or other benefits are made available to the state, its political subdivisions, or its citizens, so far as the governor deems such provisions to be in the public interest; and to this end the governor may take or cause to be taken all necessary acts including (without limitation because of enumeration) the making of leases or other contracts with the federal government; the preparation, adoption and execution of plans, methods, and agreements, and the designation of state, municipal or other agencies to perform specific duties."
Under subsec. (6), the Governor could designate counties as agencies to carry out the provisions of the federal act within their respective areas. Counties could then enter into agreements with other counties or with municipalities to qualify as prime sponsors. The provisions of sec. 16.54 (6), Stats., are presumed constitutional and the legislature intended that the Governor have such power with respect to federal legislation enacted after sec. 16.54, Stats., became law.
The Governor did by Executive Order No. 25 (1971) create a State Manpower Planning Council. It did not designate counties as participating agencies for the purposes of the federal act we are concerned with which did not become law until December, 1973.
An alternate avenue would be for the legislature to specifically provide for county participation under the full terms of the Comprehensive Employment and Training Act of 1973.
RWW:RJV *Page 465