YOUNG v DETROIT CITY CLERK

OPINION OF THE COURT

1. JUDGMENT—ACTION—QUESTION OF LAW.

A determination is not conclusive between the parties in a subsequent action on a different cause of action where a question of law essential to the judgment was actually litigated and determined by a valid and final personal judgment, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result.

2. JUDGMENT—RES JUDICATA—MANDAMUS—ELECTIONS—MAYOR.

Doctrine of res judicata should not apply to a mandamus action by a state senator to compel placing his name on the September 1973 primary ballot as a candidate for Mayor of Detroit where a decision of the Michigan Supreme Court prevented him from running for Mayor of Detroit in 1969 because a new determination is warranted in order to take account of intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.

3. CONSTITUTIONAL LAW—LEGISLATURE—CIVIL APPOINTMENT—OFFICERS.

Constitutional provisions that no person elected to the Legislature shall receive any civil appointment during the term for which he was elected have two basic purposes: (1) to prevent vote trading or logrolling in the Legislature to gain an appointment and/or (2) to prevent legislators from creating new posts

REFERENCES FOR POINTS IN HEADNOTES

[1] 46 Am Jur 2d, Judgments § 404.
[2] 52 Am Jur 2d, Mandamus § 487.
[3, 11, 13-16] 63 Am Jur 2d, Public Officers and Employees § 68.
[4] 16 Am Jur 2d, Constitutional Law §§ 26-29.
[5] 49 Am Jur, States, Territories, and Dependencies § 133.
[6] 46 Am Jur 2d, Judges § 4.
[7, 9, 10, 12] 49 Am Jur, States, Territories, and Dependencies § 52.
[8] 47 Am Jur, Schools § 2.

and running for them (Const 1850, art 4, § 18; Const 1908, art 5, § 7; Const 1963, art 4, § 9).

4. OFFICERS—CONSTITUTIONAL DELEGATE—STATE MATTERS.

A state constitutional delegate is an office which deals with state matters.

5. OFFICERS—LOCAL OFFICES—CONSTITUTIONAL LAW—STATUTES.

There is no such thing as a completely local office; all offices are ultimately derived from the state constitution and all laws are passed by the state Legislature, and in most cases, signed by the Governor of the state.

6. JUDGES—CIRCUIT JUDGES—STATE OFFICIALS.

Circuit judges are state officials.

7. OFFICERS—STATE OFFICES—LOCAL OFFICES.

The distinction of state and local offices depends on not whether an official has one or more state duties, but whether the office is primarily local or state on the basis of the overall duties.

8. SCHOOLS AND SCHOOL DISTRICTS—PUBLIC SCHOOLS—STATE SCHOOLS —STATE AGENCIES.

All public schools throughout the state are state schools and agencies of the state.

9. COURTS—STATE OFFICES—CONSTITUTIONAL LAW.

A section of an article of the Michigan Constitution provides in part that "[t]he judicial power of the state is vested exclusively in one court of justice * * * "; thus, all courts within the state are part of the one court of justice and clearly state offices (Const 1963, art 6, § 1).

10. OFFICERS—STATE OFFICES—LOCAL OFFICES—STATE FUNCTIONS— APPEAL AND ERROR.

Holding of the Michigan Supreme Court that *performing any state functions* makes an office a state rather than a local one has been overruled by later decisions.

11. OFFICERS—MAYOR—CITY TREASURER—STATE OFFICES—APPEAL AND ERROR.

Michigan Supreme Court decisions that the offices of Mayor of Highland Park, Mayor of Detroit, and Treasurer of Detroit were state offices under the constitutional provision that no

person elected to the Legislature shall receive any civil appointment during the term for which he is elected were incorrectly decided and should be overruled (Const 1963, art 4, § 9).

12. OFFICERS—MAYOR—CITY CHARTER—CONSERVATOR OF THE PEACE— CONSTITUTIONAL LAW—STATUTES—STATE OFFICIAL—LOCAL OFFICER.

The office of Mayor of Detroit is primarily local in character and almost all the duties of that office, set out in the Charter of that city, deal with municipal concerns; the fact that the mayor is the conservator of the peace and must perform acts required by the constitution and state laws, does not make him a state official; rather, this is an incident to a local office held by him, an imposition upon a local officer of the performance of state duties (Detroit Charter, Title 6, ch 3, § 7).

13. OFFICERS—MAYOR OF DETROIT—LOCAL OFFICES—STATE OFFICES— CONSTITUTIONAL LAW—ELECTIONS.

Office of Mayor of Detroit is a local office and not a state office; constitutional provision prohibiting a person elected to the Legislature from receiving any civil appointment during the term for which he is elected does not bar plaintiff, a state senator, from being a candidate in the 1973 Detroit primary election (Const 1963, art 4, § 9).

CONCURRING OPINION

T. M. KAVANAGH, C. J.

14. OFFICERS—MAYOR—STATE OFFICER—STATE FUNCTIONS—CONSERVATOR OF THE PEACE—STATE SENATOR—ELECTIONS.

*A state senator is not barred from being a candidate for Mayor of the City of Detroit during his term of office because the function of conservator of the peace was given to the mayor of a city almost a century ago when there were no organized police departments or other organizations to keep the peace; for a number of years now it would appear that rarely is this authority ever used by the mayor of a city, particularly a large city and other functions mayors performed have since become extinct; thus, the rule expressed in past decisions of the Michigan Supreme Court that the offices of Mayor of Highland Park and Mayor of Detroit perform state functions making the office a state rather than a local one has too long survived its underlying reasons.*

15. CONSTITUTIONAL LAW—CONSTRUCTION—LEGISLATURE—CIVIL AP-
POINTMENT—ELECTIONS.

*Historical factors require a process of legal interpretation of a
section of an article of the Michigan Constitution which pro-
vides that "[n]o person elected to the legislature shall receive
any civil appointment within this state from the governor,
except notaries public, from the legislature, or from any other
state authority, during the term for which he is elected" that
seems at variance with modern understanding of the plain
language of that section; as, historically, "appointment" means
"election" as well as · "appointment" and historically "any"
means any state as opposed to local appointment (Const 1963,
art 4, § 9).*

16. CONSTITUTIONAL LAW—CONSTRUCTION—LEGISLATOR—ELECTIONS—
MAYOR—OFFICERS—LOCAL OFFICER—CIVIL APPOINTMENT.

*Applying a literal interpretation of the Michigan constitutional
provision that "[n]o person elected to the legislature shall
receive any civil appointment within this state from the gover-
nor, except notaries public, from the legislature, or from any
other state authority, during the term for which he is elected"
the Michigan Supreme Court would have to say a legislator can
seek election to the office of Mayor of Detroit because the
constitution prohibits only appointments and applying a legal,
based on historical, interpretation, that Court is compelled to
say a legislator can seek election to the office of Mayor of
Detroit not because an election is not an appointment but
because "any civil appointment within the state" means "any
civil appointment within the state" except a local one and
obviously a mayor is a local officer (Const 1963, art 4, § 9).*

Appeal from Wayne, John M. Wise, J., and from
Court of Appeals prior to decision. Submitted April
5, 1973. (No. 16 April Term 1973, Docket No.
54,620.) Decided May 10, 1973.

Complaint by Coleman A. Young and others
against the City Clerk for the City of Detroit for
mandamus to compel defendant to accept the ap-
plication and filing fees of Young and place his
name on the primary ballot for the office of Mayor

of the City of Detroit. Accelerated judgment for defendant. Plaintiffs appealed to the Court of Appeals and applied to the Supreme Court for leave to appeal prior to decision by the Court of Appeals. Leave granted. Reversed and remanded for issuance of writ.

*Basil W. Brown, Daniel S. Cooper, William A. Cilluffo, Roger E. Craig, Elliot S. Hall, Maurice Kelman,* and *George G. Newman,* for plaintiffs.

*Michael M. Glusac,* Corporation Counsel, and *John E. Cross* and *Maureen P. Reilly,* Assistants Corporation Counsel, for defendant.

SWAINSON, J. On December 19, 1972, Coleman Young attempted to file nominating petitions and a filing fee as a candidate for Mayor of Detroit in the primary election to be held on September 11, 1973. The filing was rejected by the defendant, City Clerk George Edwards, on the ground that Coleman Young, as an incumbent state senator, is barred from running for Mayor of Detroit by Const 1963, art 4, § 9, which provides:

"No person elected to the legislature shall receive any civil appointment within this state from the governor, except notaries public, from the legislature, or from any other state authority, during the term for which he is elected."

Following this rejection, on the same day, Senator Young and a number of Detroit voters supporting his candidacy brought suit in Wayne County Circuit Court requesting an order of mandamus to place him on the September 1973 primary ballot as a candidate for mayor. A hearing was held in the circuit court on January 15, 1973. At the conclusion of the arguments, the trial court issued

an opinion dismissing the complaint. A formal order granting accelerated judgment in favor of defendant was entered on January 22, 1973.

Plaintiffs filed a claim of appeal in the Court of Appeals and concurrently filed an emergency application in the Supreme Court for bypass. This Court granted bypass leave on March 1, 1973.

Several issues are raised on appeal. The first issue is whether the decision of this Court in *Young v Leadbetter,* No 52,523 (July 2, 1969), preventing plaintiff from running for mayor in 1969 is res judicata as applied to this case. In the 1969 *Young* case, our Court summarily affirmed a circuit court decision preventing plaintiff from appearing on the ballot as a candidate for mayor based on Const 1963, art 4, § 9. Where questions of law are involved, the courts have been reluctant to apply the rule of res judicata. The general rule is found in Restatement Judgments, § 70, pp 318–319:

"Where a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result."

A proposed draft revision of this section, Restatement Judgments, 2d, Tentative Draft No. 1, 1973 states the following exceptions to the use of the doctrine of res judicata in § 68.1:

"Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the

issue in a subsequent action between the parties is not precluded in the following circumstances:

\*   \*   \*

"(b) The issue is one of law and \* \* \*

\*   \*   \*

"(ii) A new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws: \* \* \* ."

The purpose of this section is explained by the Commentary, as follows:

"A rule of law declared in an action between two parties should not be binding on them for all time, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected. Such preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position."

The United States Supreme Court has shown a reluctance to apply res judicata to pure questions of law. In *Commissioner of Internal Revenue v Sunnen,* 333 US 591, 599; 68 S Ct 715; 92 L Ed 898 (1948), the Court stated:

"A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws,

discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. Compare *United States v. Stone & Downer Co.,* 274 U.S. 225, 235–236 [47 S Ct 616; 71 L Ed 1013 (1927)]. Such consequences, however, are neither necessitated nor justified by the principle of collateral estoppel. That principle is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers."

This is a case where the doctrine of res judicata should not apply because of the reasons stated in § 68.1(b), (ii), *supra.* Plaintiff has raised a constitutional challenge to Const 1963, art 4, § 9 if it prevents him from becoming a candidate for Mayor of the City of Detroit. Since the time of the first *Young* case, there has been a great deal of change " * * * in the applicable legal context * * * ."[1] In addition, the rule of res judicata should not be applied to plaintiff in order " * * * to avoid inequitable administration of the laws; * * * ." The first *Young* case is not a case that has been reaffirmed on numerous occasions. The case was decided without a written opinion during the last Detroit mayoral primary election. It is clear that any other state legislator could raise these issues and would not be precluded from doing so. Thus, it is inequitable to prevent this plaintiff from doing so. We therefore hold that the

[1] Numerous cases have been decided by both the Federal and state courts expanding the right to vote and the right to run for office since 1969. See, for example, *Dunn v Blumstein,* 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972); *Evans v Cornman,* 398 US 419; 90 S Ct 1752; 26 L Ed 2d 370 (1970); *Stapleton v Inkster City Clerk,* 311 F Supp 1187 (ED Mich, 1970); *Bolanowski v Raich,* 330 F Supp 724 (ED Mich, 1971); *Mogk v Detroit,* 335 F Supp 698 (ED Mich, 1971); and *Wilkins v Ann Arbor City Clerk,* 385 Mich 670 (1971).

doctrine of res judicata does not bar plaintiff's cause of action in this case.

Thus, we reach the basic issue in this case which is whether Const 1963, art 4, § 9 prohibits plaintiff from being a candidate for the office of Mayor of the City of Detroit?

I.

The predecessor to Const 1963, art 4, § 9 first appears in the 1850 Michigan Constitution. Const 1850, art 4, § 18 provided:

"No person elected a member of the legislature shall receive any civil appointment within this state, or to the senate of the United States, from the governor, the governor and senate, from the legislature, or any other state authority, during the term for which he is elected. All such appointments and all votes given for any person so elected for any such office or appointment shall be void. No member of the legislature shall be interested, directly or indirectly, in any contract with the state or any county thereof, authorized by any law passed during the time for which he is elected, nor for one year thereafter."

Const 1908, art 5, § 7 was the successor to Const 1850, art 4, § 18. That provision provided:

"No person elected a member of the legislature shall receive any civil appointment within this state or to the senate of the United States from the governor, except notaries public, or from the governor and senate, from the legislature, or any other state authority, during the term for which he is elected. All such appointments and all votes given for any person so elected for any such office or appointment shall be void. No member of the legislature shall be interested directly or indirectly in any contract with the state or any county thereof, authorized by any law passed during the time for which he is elected, nor for one year thereafter."

This in turn is derived from NY Const 1821, art 1, § 10 which provided:

"No member of the legislature, shall receive any civil appointment from the governor and senate or from the legislature, during the term for which he shall have been elected."[2]

This provision was passed without a rollcall vote by the convention on November 8, 1821. See *Report of the Debates and Proceedings of the Convention of the State of New York—1821* by L. H. Clarke, p 339; *Journal of the Convention of the State of New York—1821* published by Cantine and Leake, p 460. This section was not debated because there was unanimity on its importance. The purpose of the New York provision was stated by the Court in *Stewart v Mayor of the City of New York,* 15 App Div 548; 44 NYS 575 (1897). The Court stated (pp 551–552):

"*In other words, we think the evil which the amendment sought to remedy and prevent was the corruption of the appointing power and the Member of Assembly,* rather than to exclude the Member of Assembly from participation in the civil service of the State. And the reason appears quite plain in the fact that, between the several sources of the power of appointment mentioned in the Constitution, and a Member of Assembly, there exists a relation by which the one or the other might be influenced in his official action. *The appointing power might, in consideration of a vote for a particular measure, hold out as an inducement thereto a promise of*

[2] This provision was probably derived from art I, § 6, clause 2 of the United States Constitution which provides:

"No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."

*appointment to a particular office. So, on the other hand, a Member of Assembly might withhold a vote for a particular measure in order to coerce the appointing power into a compliance with his demand for civil appointment.* In other words, if the power existed to give and the right existed to receive, it could be made the basis of traffic for official action, and this evidently was the evil at which the amendment was aimed." (Emphasis added.)

## II.

The first Michigan case to discuss the purpose of Const 1850, art 4, § 18 was *Ellis v Lennon,* 86 Mich 468 (1891). Respondent Lennon had been elected an alderman of West Bay City for a two-year term commencing April 10, 1890. He resigned on April 13, 1891 and was appointed chief of police of the city. The Court held that he must vacate the office because of a charter provision which provided in part (86 Mich 472):

" '[N]o alderman shall be elected or appointed to any other office in the city during the term for which he was elected as alderman, * * * .' "

The Court went on to say (p 473):

"The Constitution provides that—
" 'No person elected a member of the Legislature shall receive any civil appointment within this State, or to the Senate of the United States, from the Governor, the Governor and Senate, from the Legislature, or any other State authority, during the term for which he is elected.'
"The purpose of these statutes is to prevent officers from using their official positions in the creation of offices for themselves, or for the appointment of themselves to place. While the law concedes the right of resignation, it is its policy to take away all inducements to the vacation of office."

Thus, as the *Stewart* case, *supra,* and the *Ellis* case point out, this and similar constitutional provisions[3] have two basic purposes:

1. To prevent vote trading or logrolling in the Legislature to gain an appointment and/or

2. To prevent the legislators from creating new posts and then running for them.

The next case dealing with this problem and the first one to directly apply Const 1850, art 4, § 18 is *Fyfe v Kent County Clerk,* 149 Mich 349 (1907). *Fyfe* was a state senator who applied for writ of mandamus after the county clerk refused to place his name on the ballot as a delegate to the Constitutional Convention of 1907. The Legislature had passed a law providing for the calling of a constitutional convention. The Legislature set the rate of pay at $10 per day. Plaintiff, as a state senator, was of course a member of the Legislature when this law was passed. The Court held that plaintiff was barred by Const 1850, art 4, § 18 from serving as a delegate to the constitutional convention. The Court held that the term "appointment" was synonymous to "election" stating (p 350):

"It is conceded that delegates to the constitutional convention are State officers. It is held in several decisions that the terms 'appointment' and 'election' are synonymous terms. This court said, speaking through Justice CHRISTIANCY, in *People v. Hurlbut,* 24 Mich. 44 [1871]:

" 'The Constitution does not seem to have made any clear distinction between the "election" and the "appointment" of officers; and in section 18, art. 4, the terms seem to be used as synonymous, and what is usually or more properly termed the election of a senator is there designated as an appointment.' "

---

[3] For a general review of constitutional provisions preventing legislators from accepting other offices, see 118 ALR 182 and cases cited therein.

The Court then went on to explain the meaning of this provision (pp 350–351):

"The duties of delegates to the constitutional convention relate exclusively to affairs of State. They have no other function to perform than a State function. The only question, therefore, is: Does such an officer receive his appointment or election from any other State authority than the three just previously mentioned? If the framers of the Constitution meant to exclude members of the legislature from eligibility to other State offices, no language could be more comprehensive than that of 'any other State authority.' These are State officers elected by State authority. They receive a civil appointment from State authority."

Thus, it is clear that *Fyfe* was ineligible on three separate grounds. First, the functions involved related exclusively to state as opposed to local matters. Obviously a state constitutional delegate is an office which deals with state matters. Second, the plaintiff was a member of the Legislature which created the position. This is precisely the type of evil condemned in *Ellis.* Finally, the Legislature itself fixed the compensation for delegates to the constitutional convention. This is an independent basis for denying Fyfe the right to run for this office.[4] When the Legislature sets the compensation for an office, or increases the compensation during a legislator's term of office, the same type of problems arise as when the Legislature creates the office itself. Vote trading might occur whereby the compensation for an office for which a legislator desired to run was increased in return for his vote on another matter. The Court recognized that

---

[4] The United States Constitution and many state constitutions include a specific clause which states that legislators are not eligible to receive an appointment if the compensation for that office has been increased during their term of office. See, for example, US Const, art I, § 6, clause 2; Ala Const, art 4, § 59; Del Const, art 2, § 14; Miss Const, art 4, § 45; ND Const, § 39; and Wash Const, art 2, § 13.

this too would violate the broad prophylactic purpose of Const 1850, art 4, § 18.

In *Lodge v Wayne County Clerk,* 155 Mich 426 (1909), the Court articulated a distinction between state and local offices holding that the former were prohibited by Const 1908, art 5, § 7 (the successor to Const 1850, art 4, § 18) and the latter were not. Lodge, a member of the Legislature, filed a petition for mandamus requesting that he be placed on the primary ballot as a candidate for the office of county auditor. The Supreme Court granted the writ and held (pp 428–429):

"It must be obvious that the electors in choosing a State officer are performing that duty on behalf of the State, and that they are to the extent to which they act a State authority.

"But is that true of the voters of Wayne county when choosing from among their number a county officer whose duties consist of adjusting claims against the county? Under the present Constitution (section 9, art. 8), the board of supervisors is given exclusive power to fix the salaries and compensation of all county officials not otherwise provided by law. The board of supervisors —in counties having county auditors, such auditors— shall adjust all claims against the respective counties. Appeals are authorized from the decision of the board of supervisors or auditors to the circuit court in such manner as shall be prescribed by law. It is to be noticed, therefore, that the county auditors, under this provision of the Constitution, are limited in their duties to the functions which their title implies, that of an auditing board, and that their duties consist of auditing claims against their respective counties. The powers fixed by the new Constitution are less broad than existed under the old Constitution. It is to be noted that the office was not created while the relator was a member of the legislature, *and the duties of the office are purely local in their character, referring entirely to the affairs of the county."* (Emphasis added.)

The Supreme Court thus recognized a distinction if the duties of office are primarily local in character. It is clear that there is no such thing as a completely local office. All offices are ultimately derived from the State Constitution and all laws are passed by the state Legislature, and in most cases, signed by the Governor of the state. Moreover, even a local county auditor had certain duties under the laws at that time which were state duties or as later stated in *Murtha v Lindsay*, 187 Mich 79, 81 (1915):

" * * * an imposition upon a local officer of the performance of State duties."

Under 1897 CL, which was the controlling law at the time of the *Lodge* decision, the Board of Auditors of Wayne County did have several state duties. Under § 297, the county auditors had " * * * to provide a suitable place where such circuit judge or judges are designated to hold court, * * * ." Circuit judges are state officials, *Richardson v Secretary of State,* 381 Mich 304 (1968). Under § 2524, the board of auditors apportioned the *state* and county taxes. Under § 2525, before entering office the auditors were required to " * * * file in the office of the county treasurer a bond to the *people of this state,* * * * ." (Emphasis added.)

Thus, it is clear that the distinction of state and local offices depended on not whether an official had one or more state duties, but whether the office is primarily local or state on the basis of the overall duties. The following criteria were thus established by these early cases:

1. The ban applied to elections as well as appointments. *Ellis v Lennon, supra.*

2. If the Legislature created the office, then,

even if it were local in character, an incumbent legislator may not receive the office during the term for which he was elected. *Ellis v Lennon, supra; Fyfe v Kent County Clerk, supra; Lodge v Wayne County Clerk, supra.*

3. If the Legislature increases the compensation of an office, an incumbent legislator is likewise barred from succeeding during his term to the office even if it is local in character. *Fyfe v Kent County Clerk, supra; Lodge v Wayne County Clerk, supra.*

4. If the office is elective and the Legislature did not create the office during a member's term in office, and did not increase the compensation during the member's term in office, then the issue becomes whether the office is primarily local or state in character. *Fyfe v Kent County Clerk, supra; Lodge v Wayne County Clerk, supra.* If it is primarily local in character, then the ban does not apply. If it is primarily a state office, then the ban does apply. Our Court in a series of decisions following *Lodge* adhered to these distinctions.

III.

In *Murtha v Lindsay,* 187 Mich 79 (1915), the Court held that plaintiff, an incumbent legislator, could not by reason of Const 1908, art 5, § 7 be a candidate for the office of Judge of the Recorder's Court of the City of Detroit. The Court stated (pp 81–82):

"The Constitution is aimed at preventing mischief, not at remedying its effects. Whether the present jurisdiction of the recorder's court was conferred in a single act of legislation or in successive acts, it is now a court possessing a certain jurisdiction, including jurisdiction to try all persons accused of crimes committed within the city of Detroit. This is jurisdiction which may not

be conferred, nor be interfered with, by the people of the locality. *It is exercised by the person inducted into the office of recorder, not as an incident to a local office held by him, nor as an imposition upon a local officer of the performance of State duties.* * * * The recorder's court is, when exercising jurisdiction to try persons accused of crimes, under the general laws of the State, a State court; its judges exercising the powers of a circuit judge. *People v. Jackson,* 8 Mich. 78 [1860]. If a vacancy in the office is filled by appointment, the appointment must be made by the governor. *Attorney General, ex rel. Danhof, v. Renihan,* 184 Mich. 272 (151 N.W. 324) [1915]. Every argument which would support the conclusion that a member of the legislature should not be appointed or elected to the office of circuit judge applies with equal force to the appointment or election of such a member to the office of judge of the recorder's court. Much of the reasoning employed in deciding *Fyfe v County Clerk,* 149 Mich. 349 (112 N.W. 725) [1907], may be here properly employed. We conclude that relator is not eligible to the office."

Thus, the Court held that the office was primarily state rather than local in nature although it did have the power to try ordinance violations. Moreover, this Court recognized that a local office might have state duties "as an incident to a local office" and that "an imposition upon a local officer of the performance of State duties" would not convert the local office to a state one.

In *Weza v Auditor General,* 297 Mich 686 (1941), the Court held that a member of the state Legislature was eligible to serve as a county school commissioner of Ontonagon County, but the Court further held that the two offices were incompatible and the acceptance by plaintiff of the county office vacated the legislative seat. 297 Mich 686, 689, 691. It should be noted in passing there was also imposed upon this local officer the performance of significant state duties. Under 1929 CL 7706, the

county school commissioners had a duty to send
notice of their appointment to the superintendent
of public instruction, a state official. There is also
a duty "[t]o be subject to such instruction and
rules as the superintendent of public instruction
may prescribe * * * " and to make annual reports
to the superintendent. Moreover, it is clear that
even without specific duties, all " * * * public
schools throughout the state are state schools and
agencies of the state." *Governor v State Treasurer,*
389 Mich 1, 13 (1973), (see pre-1949 cases cited on
pp 348–350).

*Attorney General ex rel Cook v Burhans,* 304
Mich 108 (1942) was a quo warranto proceeding to
determine defendant's right to serve as a regent of
the University of Michigan. Defendant was a mem-
ber of the state Legislature who had been elected
as regent of the University of Michigan during his
term of office. The Court held that regent is a state
office and that defendant was ineligible to serve.
The Court held (p 111):

"The university is a State institution, with obligation
on the legislature to maintain it. The regents are State
officers and, as the board of regents, constitute the body
corporate known as the 'Regents of the University of
Michigan' and have the general supervision of the
University and the direction and control of all expendi-
tures from the university funds. Const. 1908, art. 11,
§ 5. In *People, for use of Regents of the University of
Michigan, v. Brooks,* 224 Mich. 45 [1923], we held the
board of regents is a department of the State govern-
ment created by the Constitution to perform State
functions."

This was the final case to be decided by our
Court under Const 1908, art 5, § 7.[5]

---

[5] The Attorney General in subsequent opinions recognized the
distinction between state and local offices under the 1908 Constitu-
tion. See, for example, OAG, 1957, No 2988, pp 247–248 (May 13,
1957):

"To recapitulate: The holder of a state office is not prohibited

In *Richardson v Secretary of State,* 381 Mich 304 (1968), the Court held that an incumbent state senator was ineligible to run for a newly created circuit judgeship. The Court held unconstitutional as a usurpation of the judicial power 1968 PA 152 which provided that the term "election" is not synonymous with "civil appointment" as used in Const 1963, art 4, § 9. The Court further held that art 4, § 9 was to be interpreted the same as previous provisions in the 1850 and 1908 Constitutions and that the meaning of the previous constitutional provisions was brought forward into the 1963 Constitution. The Court thus implicitly recognized that the state versus local distinction applied under the new constitution.[6]

thereby from becoming a candidate for and being elected to a local office."

[6] There is a great deal of support for the Court's interpretation that Const 1963, art 4, § 9 is basically the same as Const 1908, art 5, § 7. See OAG 1963–1964, No 4169, pp 121–122 (June 17, 1963). An article by Melvin Nord, who was a delegate to the Constitutional Convention, *The Michigan Constitution of 1963,* 10 Wayne L Rev 309, 327 (1964) supports the view that art 4, § 9 did not basically change Const 1908, art 5, § 7:

"Section 9. (Ineligibility of legislators for certain appointments): The principal changes in this section are: (1) the elimination of the disqualification of a legislator from being appointed a United States Senator; and (2) the elimination of the language, 'All such appointments and all votes given for any person so elected for any such office or appointment shall be void.' The latter change was not considered by the Constitutional Convention to be a substantive change; *thus, the former judicial construction that this provision also prohibits legislators running for state office by election, but not from purely local office, should be continued* if the 'words' of the Constitutional Convention (in the 'Address to the People') are allowed to speak louder than their actions (deleting the sentence relating to 'votes,' the only language in the section tending to indicate that 'appointment' includes 'election'). This is precisely the position which has been taken by the Attorney-General, who has accordingly rendered an opinion that legislators may not legally run for election to any judicial office (since all judges are 'state' officers, in view of the fact that the new constitution creates a single 'court of justice' with several divisions.)" (Emphasis added.)

See also *Address to the People—What the Proposed New State Constitution Means to You*—a pamphlet prepared in accordance with 1961 PA 8 (August 1, 1962), p 30.

The *Richardson* decision is sustainable on two separate grounds. First, Const 1963, art 6, § 1 provides that "[t]he judicial power of the state is vested exclusively in one court of justice * * * ." Thus, all courts within the state are part of the one court of justice and clearly state offices.[7] Second, this office was created during Richardson's term of office and thus, comes under the original prohibition discussed in *Ellis v Lennon, supra.*

However, in a trilogy of decisions issued before the 1968 general election and 1969 Detroit primary election, the Court held that the offices of Mayor of Highland Park, *McCoy v Board of Election Commissioners of Highland Park,* No 52,217 (Oct. 22, 1968); Mayor of Detroit, *Young v Leadbetter,* No 52,523 (July 2, 1969); and Treasurer of Detroit, *O'Brien v City of Detroit Election Commission,* 383 Mich 707 (1970)—decision rendered August 19, 1969—were state offices under Const 1963, art 4, § 9. Defendant urges that these cases control the present situation. Plaintiff urges that under the pre-*McCoy* cases previously discussed, the Mayor of the City of Detroit is a local office and not a state office and that *McCoy, Young v Leadbetter,* and *O'Brien* were incorrectly decided. We thus turn to the issue of whether the Mayor of the City of Detroit is a state or a local official as that term is used in Const 1963, art 4, § 9?

## IV.

In *O'Brien v City of Detroit Election Commission, supra,* the Court referred to *Attorney Gen-*

---

[7] See also *Address to the People, supra,* p 55:

"1. It creates a 'court of justice', incorporating the concept that the state has a *single court* with several divisions, each devoting its attention to a certain level of judicial administration." (Emphasis added.)

OAG 1963–1964, No 4169, *supra,* p 121.

*eral ex rel Moreland v Common Council of the City of Detroit,* 112 Mich 145, 166–168 (1897). In this case the Court declared that the Mayor of the City of Detroit was a state officer within the meaning of Const 1850, art 5, § 15,[8] because he was a conservator of the peace and had other state duties under then existing law.[9] A close look at the *Attorney General* case demonstrates that the result was reached based on the peculiar facts involved. Hazen Pingree, while an incumbent Mayor of the City of Detroit, had run for and been elected Governor of the State of Michigan. He refused to resign as mayor and the Supreme Court issued a writ of mandamus compelling the Common Council to call a special election to fill the vacancy in the mayor's office. The Court based its decision on two separate theories; first, that the office of mayor is a state office; and, second, that the two offices were incompatible. The second ground was a proper one to deny dual office holding to Mr. Pingree. The Court cited several cases discussing incompatibility including *State v Goff,* 15 RI 505, 507; 9 A 226 (1887):

"The test of incompatibility is the character and relation of the offices: as where one is subordinate to the other, and subject in some degree to its revisory power; or where the functions of the two offices are inherently inconsistent and repugnant. In such cases it has uniformly been held that the same person cannot hold both offices."

It is clear that the offices of Governor and mayor were incompatible, because under § 653, 1 How Stat (1882), the Governor had the power to remove

[8] "No member of congress, nor any person holding office under the United States, or this state, shall execute the office of governor."

[9] The duties of the Mayor of the City of Detroit were enumerated in the Charter of 1883 (Act No 326, Local Acts 1883, Chapter 5, § 1).

the mayor for certain violations of the law. Hence, the Court could have reached a decision without determining the issue of whether the mayor is a state officer. The Court seems to indicate that all office holders were state officers because they were created by state law and are all part " * * * of the one great scheme of State government." 112 Mich 154. However, the later *Lodge* and *Weza* cases do not accept this analysis and recognize a distinction between state and local offices. Any intimation in *Attorney General* that *performing any state functions* makes an office a state rather than a local one was superseded by *Lodge* and *Weza*.

In the *McCoy* case, *supra,* the Court accepted the rule of the *Attorney General* case without analyzing it in the light of later decisions. The *McCoy* case was decided under the pressure of an impending election. The time between the filing of the application for leave to appeal and the decision of the Court was only five days; from October 17 to October 22, 1969. The other cases were likewise decided under the pressure of impending elections.[10]

After a thorough consideration of this issue, we hold that the *McCoy, Young v Leadbetter,* and *O'Brien* cases were incorrectly decided and should be overruled. The duties of the Mayor of the City of Detroit are set out in the Charter of the City of Detroit—1918, Title IV, ch 3, § 7.[11] It is clear

[10] In *Young v Leadbetter, supra,* the application for leave to appeal was filed on June 24, 1969 and a decision rendered on July 2, 1969. In *O'Brien v City of Detroit Election Commission, supra,* the application for leave to appeal was filed August 11, 1969 and an order issued on August 19, 1969.

[11] The Charter was passed pursuant to 1909 PA 279. See also Const 1963, art 7, § 22 and MCLA 117.1 *et seq.;* MSA 5.2071 *et seq.*

Title IV, ch 3, § 7 of the Charter of the City of Detroit reads as follows:

from a reading of these duties that the office is primarily local in character. Almost all of the duties deal with municipal concerns. The fact that the mayor is the conservator of the peace and must perform acts required by the Constitution and state laws, does not make him a state official. Rather, in the language in *Murtha v Lindsay,* 187 Mich 81, such duties are:

" * * * an incident to a local office held by him, * * * an imposition upon a local officer of the perform- ance of State duties."

We hold that the office of the Mayor of the City of Detroit is a local office and not a state office.

"The mayor shall be the chief executive officer of the city and conservator of its peace, and his powers and duties shall be as follows:

"(a) He shall keep an office in some convenient place in the city to be provided by the common council;

"(b) See that all laws pertaining to the municipal government of the city, and all ordinances of the common council are faithfully observed and executed and report to the council any violation thereof;

"(c) Make appointments to office and make removals therefrom as prescribed in this Charter;

"(d) See that all officers of the city faithfully comply with and discharge their official duties;

"(e) Give the council from time to time such information and recommend such measures as he shall deem necessary or expedient;

"(f) Administer oaths and take affidavits;

"(g) Pass upon all ordinances, resolutions or proceedings adopted by the council; either approving or withholding approval from the same, and in his discretion veto in whole or in part any action of the council subject to the power of the common council to pass the same over his veto as herein provided;

"(h) Submit to the council annually a budget of appropriations for the succeeding fiscal year;

"(i) Issue and revoke licenses in all cases where licenses may be granted hereunder and under the ordinances of the city, except as herein otherwise provided, and approve bonds filed on the issuing of such licenses;

"(j) Make through the purchasing department of the city purchases of all materials and supplies used in his office; and

"(k) Perform all acts required by the Constitution and laws of the state and this Charter whether herein specifically enumerated or not."

Const 1963, art 4, § 9 does not bar plaintiff from being a candidate in the 1973 Detroit primary election.

The judgment of the circuit court is reversed and the cause is remanded for the issuance of the writ as requested. No costs, a public question being involved.

T. E. Brennan, T. G. Kavanagh, Williams, Levin, and M. S. Coleman, JJ., concurred with Swainson, J.

T. M. Kavanagh, C. J. I concur in the judgment and opinion of the Court. However since I joined the majority of the Court in the trilogy of decisions in which the Court held that the offices of Mayor of Highland Park, *McCoy v Board of Election Commissioners of Highland Park,* No 52,217 (Oct. 22, 1968); Mayor of Detroit, *Young v Leadbetter,* No 52,523 (July 2, 1969); and Treasurer of Detroit, *O'Brien v City of Detroit Election Commission,* 383 Mich 707 (1970), decision rendered August 19, 1969, were state offices under Const 1963, art 4, § 9, an explanation is in order.

In those cases we based our reasoning upon the fact that the mayor of a city performs certain functions for the state including, but not exclusively limited, to the fact that he is a "conservator of the peace" and therefore "performing any state functions" makes the office a state rather than a local one. Further study indicates that this function was given to the mayor of a city almost a century ago when there were no organized police departments or other organizations to keep the peace. For a number of years now it would appear that rarely is this authority ever used by the mayor of a city, particularly a large city. Other

functions mayors performed have since become extinct.

Thus, the rule expressed in our past decisions has too long survived its underlying reasons. Frank awareness of these factors prompts candid admission as made by Mr. Justice Jackson of the United States Supreme Court in *McGrath v Kristensen,* 340 US 162, 178; 71 S Ct 224; 95 L Ed 173 (1950):

"Baron Bramwell extricated himself from a somewhat similar embarrassment by saying, 'The matter does not appear to me now as it appears to have appeared to me then.' *Andrews v Styrap,* 26 LTR(NS) 704, 706 [1872]. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: 'My own error, however, can furnish no ground for its being adopted by this Court. * * * ' *United States v Gooding,* [25 US] 12 Wheat. 460, 478 [6 L Ed 693 (1827)]. Perhaps Dr. Johnson really went to the heart of the matter when he explained a blunder in his dictionary—'Ignorance, sir, ignorance.' But an escape less self-depreciating was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: 'I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion.' If there are other ways of gracefully and good-naturedly surrendering former views to a better considered position, I invoke them all."

With this explanation I concur in the opinion of the Court as authored by Justice SWAINSON.

WILLIAMS, J. *(concurring).* This opinion is as much a respectful suggestion to the next Constitutional Convention as it is a legal holding. The reason for this is that historical factors require a process of legal interpretation of Const 1963, art 4, § 9 that seems at variance with modern under-

standing of the plain language of that section. As it happens, the interpretative result in this case turns out the same but whether the common required result is one the people really want is impossible to say. Only a Constitutional Convention can get us clearly out of the mess we are in.

Const 1963, art 4, § 9 reads:

"No person elected to the legislature shall receive any civil appointment within this state from the governor, except notaries public, from the legislature, or from any other state authority, during the term for which he is elected."

If we were reading art 4, § 9 outside of any historical or precedential context, we would undoubtedly read "appointment" as just that, that is, designation by an appointing authority as opposed to "election" by the people. We would interpret "any civil appointment within this state" as any office within the geographical confines of the state, and thus include *local* as well as *state* offices.

However, historically, as my Brother SWAINSON clearly points out, "appointment" means "election" as well as "appointment". Likewise historically (before the 1963 constitution which must be assumed to adopt it) "any" means any *state* as opposed to *local* appointment.

Applying a literal interpretation of art 4, § 9 to the instant case this Court would have to say a legislator can seek *election* to the office of Mayor of Detroit, because the constitution prohibits only *appointments.* Applying a legal, based on historical, interpretation, this Court is compelled to say a legislator can seek election to the office of Mayor of Detroit not because an election is not an appointment but because "any civil appointment within the state" means "any civil appointment

within the state" except a local one. Obviously a mayor is a local officer. A literal common sense interpretation and a historical interpretation of art 4, § 9 reach the same conclusion on almost diametrically opposite rationale.

For these reasons I concur with my Brother SWAINSON, there is no other legal choice. Whether this is really the will of the people is hard to say. If the people's will is expressed by the contemporary understanding of the plain words of art 4, § 9, this Court has no difficulty. If the people's will is expressed by the legal interpretations of history, there is also no difficulty. But if the people in approving the 1963 constitution relied in part on the plain language and in part on history,[1] the Court can only speculate on what the people really had in mind. Recent referenda suggest what they have in mind today may be something different from either a correct plain language or historical interpretation. However, this Court is perforce bound by history and the law. It is for these reasons I suggest that the next Constitutional Convention might well consider fresh language for this section reenforced by comprehensive and specific committee commentary to make clear beyond per adventure whatever the people's will actually is.

---

[1] *See* Justice SWAINSON's opinion, page 351, footnote 6.